UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IMG FRAGRANCE BRANDS, LLC,
a Delaware limited liability company,
DANA CLASSIC FRAGRANCES, INC.,
a Delaware limited liability company,
ZOHAR CDO 2003-1 LIMITED,
a Cayman Islands exempted company,
ZOHAR II 2005-1 LIMITED,
a Cayman Islands exempted company,
ZOHAR III LIMITED,
a Cayman Islands exempted company, and
IMG HOLDINGS, INC.,
a Delaware corporation,

                                    Plaintiffs,

—against—

HOUBIGANT, INC.,
a Delaware corporation,
ETABLISSEMENT HOUBIGANT,
a Lichtenstein corporation, and
MICHAEL J. SHERMAN,
an individual New York resident,

                                    Defendants.

09 Civ. 3655

## AMENDED COMPLAINT

Plaintiffs allege as follows:

## NATURE OF ACTION

1.     This action concerns a License Agreement between plaintiff IMG Fragrance

Brands, LLC ("IMG") and defendants Houbigant, Inc. and Etablissement Houbigant

(collectively, "Houbigant") under which Houbigant promised to license certain fragrance product

trademarks to IMG for a period of five years, and further promised to sell those trademarks to

IMG at the end of the term for a nominal fee of $1,000, plus any unpaid royalties.  After the

License Agreement expired, IMG had already paid over $9 million towards the total

contemplated royalties of $10.5 million. IMG twice attempted to pay Houbigant the outstanding royalties, plus $1,000, to purchase the trademark rights, but Houbigant, evidently regretting the original agreement, refused to accept. By this lawsuit, IMG seeks declaratory relief and specific performance of Houbigant's obligation to sell the trademark rights.

2.      This action also seeks relief on behalf of certain lenders to Dana Classic Fragrances, Inc. ("Dana"), IMG's sub-licensee and the entity that actually operated the fragrance business. (IMG guaranteed the loans to Dana and the companies have a common parent.) After a default by Dana in October 2008, the lenders gained a controlling equity position in the parent of IMG and Dana from its former CEO and controlling stockholder, Isaac Cohen. The lenders have since discovered a disturbing amount of fraud and other misconduct by Cohen, CFO Gina Zamarelli (with whom Cohen was having an affair), and other members of IMG's former management, including fraud and misconduct that was aided in substantial part by Houbigant and its principal, defendant Michael Sherman.

3.      Among other things, the lenders discovered that Sherman and IMG's former management entered into a series of unauthorized and unlawful agreements that purported to amend the License Agreement, notwithstanding that the lenders maintained a security interest in the License Agreement and an express right to approve any amendments. These improper agreements, which Houbigant and Sherman concealed from the lenders, include certain "consulting" agreements which purported to authorize exorbitant fees to Houbigant in exchange for no consideration. The apparent purpose for all of these agreements was to allow Cohen and Zamarelli to maintain control over IMG and prevent the lenders from foreclosing on the loans and instead induce them to make further loans, while allowing Houbigant and Sherman to be paid far beyond what the License Agreement and financing agreements otherwise allowed. This

lawsuit seeks to declare all of these unauthorized agreements void and to recover the damages caused by the defendants' conduct in entering into the agreements and fraudulently concealing the agreements and the circumstances leading to the agreements.

**PARTIES**

4.    Plaintiffs IMG Fragrance Brands LLC ("IMG"), IMG Holdings, Inc. ("IMG Holdings") and Dana Classic Fragrances, Inc. ("Dana") are Delaware limited liability companies with their principal place of business in Saddle Brook, New Jersey.  IMG Holdings is the sole member of IMG and the parent of Dana.  These entities are part of a group of businesses known as "Dana," which makes and sells a portfolio of iconic fragrance products, including the products that are at issue in this litigation.

5.    Plaintiffs Zohar CDO 2003-1, Limited ("Zohar I"), Zohar II 2005-1 Limited ("Zohar II") and Zohar III Limited ("Zohar III," and collectively, the "Zohar Funds") are Cayman Islands exempted companies, managed by Patriarch Partners, LLC and affiliates that have their principal place of business in New York, New York.  The Zohar Funds are investments funds that make secured loans to, and acquire, distressed business, including Dana and its various affiliates.

6.    Defendants Houbigant, Inc. and Etablissement Houbigant (collectively, "Houbigant") are corporations organized under the laws of Delaware and Lichtenstein, respectively.  They are in the business of licensing trademarks and their only two employees are defendant Michael J. Sherman ("Sherman"), Houbigant's CEO, and his wife Frances Sherman.  Houbigant's principal place of business is the Shermans' apartment, which is located at 333 East 68th Street, New York, New York.

7.    In 2004, Michael Sherman pled guilty to falsifying business records and criminal possession of stolen property in connection with his role in stealing from distressed and bankrupt companies. He was sentenced to 2 ½ to 7 ½ years of imprisonment, and his workout firm agreed to pay $6 million in fines, along with the costs of prosecution.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 because the action arises under federal law. In particular, this action asserts a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, and seeks a declaration in anticipation of, and in defense of, coercive relief brought against IMG under the Lanham Act, 15 U.S.C. § 1114. The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the claim under the Declaratory Judgment Act.

9.    With proper service, this Court will acquire personal jurisdiction over the defendants under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and N.Y. C.P.L.R. § 301 because Sherman is a resident of New York and Houbigant regularly transacts business in New York.

10.    Venue is appropriate in this District under 28 U.S.C. § 1391(b)(1) because all the defendants are located in the District. Alternatively, venue is appropriate under 28 U.S.C. § 1391(b)(3) because one or more defendants may be found in this District.

## STATEMENT OF FACTS

**The License Agreement**

11.    On December 19, 2003, Houbigant and IMG entered into a License Agreement under which Houbigant granted IMG the exclusive, worldwide right to manufacture and

distribute certain perfume and fragrance products developed by Houbigant and bearing its registered trademarks.  Houbigant also agreed to "assist . . . in the promotion of the sales" of the licensed products, "so as to enhance the reputation" of the products.  In exchange, IMG agreed to pay royalties of $175,000 per month over the Agreement's five-year term.  IMG sub-licensed the License Agreement to Dana.

**The September 2004 Loans and Assignments**

12.     On September 30, 2004, certain Dana entities entered into a Loan and Security Agreement with Congress Financial Corporation ("Congress") and certain other lenders, with a maximum loan amount of $23 million.  As part of that Agreement, IMG pledged substantially all of its assets as collateral to secure the loans.  Isaac Cohen, IMG's CEO, also pledged his 100% ownership interest in the stock of IMG Holdings as collateral for the loans.  The lenders were empowered to foreclose upon these assets, and Cohen's stock, upon an event of default.

13.     In connection with the Loan Agreement, IMG and Houbigant executed a Collateral Assignment of License Agreement, under which IMG pledged its interest in the License Agreement as further collateral for the loans.  The agreement required, for the benefit of the lenders, that IMG and Houbigant obtain the written consent of Congress, as agent for the lenders, before amending or modifying the License Agreement.

14.     Houbigant, Inc. and Etablissement Houbigant, as Licensors under the License Agreement, each separately executed the Collateral Assignment of License Agreement under the statement:  "Each Licensor hereby consents and agrees to the provisions of the Collateral Assignment as of the date hereof."

15.     At the same time, both Houbigant, Inc. and Etablissement Houbigant also entered into an agreement entitled "Licensor's Consent to Use of Trademarks and Products," under

which they agreed (among other things) to give Congress written notice of any event which they claimed would constitute a default by IMG under the License Agreement, as well as an opportunity to cure such defaults on IMG's behalf, prior to exercising any rights or remedies under the License Agreement.

16.    Both the Licensor's Consent and the Collateral Assignment of License Agreement expressly stated that they would be enforceable by Congress' successors or assigns. By April 2007, the Zohar Funds had succeeded to Congress' loans (and the loans of Congress' prior successors) and an affiliate and agent of the Zohar Funds succeeded to Congress' rights as agent under the Collateral Assignment of License Agreement and the Licensor's Consent.

**The June 2007 Loans and Assignments**

17.    In connection with a restructuring of the loans on June 28, 2007, Houbigant executed an additional Collateral Assignment of License Agreement and an additional Licensor's Consent. These agreements provided Wells Fargo Foothill, Inc. ("Wells"), as agent for a new set of lenders, substantially similar rights as Congress had been given as part of the September 2004 agreements. In December 2008, Zohar II and Zohar III succeeded to Wells' loans and an affiliate and agent of the Zohar Funds succeeded to Wells as agent for those loans.

18.    The June 2007 Collateral Assignment of License Agreement and Licensor's Consent did not supersede or otherwise extinguish the ones executed in September 2004. Thus, any amendment of the License Agreement after June 28, 2007 required written consent of the appropriate agent under both agreements. Similarly, if IMG were alleged to be in default under the License Agreement at any point after June 28, 2007, these same parties were entitled to notice and an opportunity to cure.

**The Unauthorized Agreements**

19.     Notwithstanding these express and unambiguous strictures, Cohen and the Shermans executed at least thirteen documents that purported to amend the License Agreement, without first seeking lender approval:

| No. | Agreement | Date |
|-----|-----------|------|
| 1. | Second Deferral Agreement | May 22, 2005 |
| 2. | Third Deferral Agreement | Sept. 18, 2006 |
| 3. | Consulting Agreement | Sept. 18, 2006 |
| 4. | Product Development and Marketing Agreement | Sept. 18, 2006 |
| 5. | Deferral Fee Agreement | Sept. 18, 2005 |
| 6. | Second Deferral Fee Agreement | Dec. 27, 2005 |
| 7. | Third Deferral Fee Agreement | Sept. 18, 2006 |
| 8. | Fourth Deferral Agreement | Nov. 30, 2006 |
| 9. | Fourth Deferral Fee Agreement | Nov. 30, 2006 |
| 10. | Amended Consulting Agreement | April 17, 2007 |
| 11. | Amended Product Development and Marketing Agreement | April 17, 2007 |
| 12. | Fifth Deferral Agreement | Aug. 27, 2008 |
| 13. | Second Amended Consulting and Product Development Agreement | Aug. 28, 2008 |

20.     There is no written consent from any lender with respect to any of the above agreements.  Prior written consent was a condition precedent to any amendment to the License Agreement.

21.     The various Deferral and Deferral Fee Agreements changed the payment schedules for royalties in exchange for interest and/or fees. The Fifth Deferral also purported to eliminate IMG's right to cure defaults under the License Agreement. To the extent the Deferral Agreements were executed in response to any alleged defaults of IMG, Houbigant failed to give written notice and an opportunity to cure of those defaults to the lenders, as required by the Licensor's Consent agreements.

22.     The lenders not only did not consent to the Deferral Agreements, but, at least as far as the Zohar Funds are concerned, they never would have done so. If there were a problem with IMG's ability to make royalty payments, the Zohar Funds would have used their leverage to force a renegotiation of the License Agreement, covered the shortfall themselves, or simply foreclosed on the loans. By purporting to increase IMG's liability to Houbigant beyond the payments required under the License Agreement, these unauthorized agreements impaired the lenders' security interest in that Agreement.

23.     The Consulting and Product Development Agreements were equally unauthorized and even more nefarious. They were originally executed at a time when the lenders, as a condition for waiving the borrowers' defaults under the loans, insisted that IMG obtain a forgiveness of certain royalty obligations from Houbigant. IMG obtained the forgiveness the lenders sought, but then secretly executed the Consulting and Product Development Agreements, which called for the precise amount of money supposedly "forgiven"—six months of royalties, totaling $1,050,000—to be paid to Houbigant anyway.

24.     The supposed "consideration" for these payments was Houbigant's agreement to "provide advice on entering markets" and on "finding distributors or customers" for the licensed products. Houbigant retained "sole discretion" to determine whether these services would

actually require anyone at Houbigant to travel anywhere. These "services" were illusory, as evidenced by (among other things) the following:

(a)  The "services" duplicate Houbigant's obligation under the License Agreement to "assist . . . in the promotion of the sales" of the licensed products, and to "enhance the[ir] reputation."

(b)  These "services" are capped at 40 hours per month under the Consulting Agreement and 20 hours per month under the Product Development Agreement, which represents hourly rates of $1,093.75 and $2,187.50, respectively.

(c)  Houbigant has recently admitted in a pleading that *no services were performed* under these agreements. (Answer and Counterclaims ¶ 194, *IMG Fragrance Brands L.L.C. v. Houbigant, Inc.*, No. 09 Civ. 3655 (S.D.N.Y. May 6, 2009) (Docket No. 10) (alleging that Houbigant was "ready, willing and able to provide the services," but was never "call[ed] upon" to do anything).)

25.    The amendments to the Consulting and Product Development Agreements merely inflated the amounts owing and compounded the wrongdoing. There was no consideration, much less written lender consent, for any of them.

26.    By failing to seek written consent for the various unauthorized agreements, Isaac Cohen and his associate and mistress Gina Zamarelli prevented the lenders from foreclosing on the loans and taking away Cohen's controlling stock position in the business. By failing to seek prior written consent for these unauthorized agreements or to provide the lenders notice of and

opportunity to cure any alleged defaults, Sherman and Houbigant were able to extract payments from and impose liabilities on the Dana business that were otherwise unauthorized.

**Sherman and Houbigant Conspired with and Aided and Abetted the Fraud and Breaches of Fiduciary Duty of IMG's Former Management**

27.     From at least April 2005 through 2008, Sherman and Houbigant conspired with IMG's former management to defraud the Zohar Funds and/or the other lenders whose rights the Zohar Funds have succeeded to.  IMG's former management, including Cohen and Zamarelli, made or caused to be made numerous misrepresentations to the Zohar Funds regarding the status of IMG's compliance with the License Agreement and the financial prospects of the Dana business, and actively concealed the existence and terms of the unauthorized amendments, as well as the purported additional liabilities imposed therein.  Sherman and Houbigant knew about this fraudulent conduct and substantially assisted IMG's former management in carrying out the fraud.  The defendants' wrongful actions induced the Zohar Funds to become lenders to the Dana businesses in May 2005 and thereafter to provide further loans to them, instead of either cutting off further credit or foreclosing earlier.

28.     On May 26, 2005, Zohar II agreed to assume certain of the loans originally made by Congress under the September 2004 Loans, and Zohar I made additional loans to Dana and its affiliates.  In the course of negotiations, the Zohar Funds displayed a keen interest in the License Agreement, which accounted for Dana's largest selling products.  The lenders insisted on a representation from Houbigant that IMG was in good standing prior to closing the loans.

29.     Unbeknownst to the Zohar Funds, IMG had not paid any royalties for several months and was in default on its payment obligations under the License Agreement.  Rather than provide notice and an opportunity to cure the default to the lenders as they were obligated to do, Sherman and Houbigant negotiated a secret Second Deferral with Cohen and/or Zamarelli

without seeking prior written consent from the lenders.  This Second Deferral purported to amend the License Agreement and called for more interest and fees, including a new $350,000 fee to be paid to Houbigant when the license terminated.

30.     Despite the fact that the Second Deferral was entered into within days of the closing of the Zohar Funds' initial loans, the Zohar Funds were completely unaware of the Second Deferral at the time.  This was by design.

31.     By early 2005, Sherman and Houbigant were finalizing the Second Deferral with Cohen and/or Zamarelli.  They had agreed on a deferred payment schedule for past due payments that required double payments for the period September 2005 through December 2005.  Yet on May 19 and May 20, 2005, in response to requests from the Zohar Funds, Cohen and/or Zamarelli caused Dana's agent, Corporate Revitalization Partners, to send false cash forecasts to the Zohar Funds purporting to project monthly cash outlays for the Houbigant royalty.  The cash forecasts showed monthly payments for each month for the period September 2005 through December 2005 of $232,000, rather than the $487,200 of payments of royalty, interest and/or fees that Sherman and Houbigant had extracted through the Second Deferral.  Cohen and/or Zamarelli knew that the May 19 and May 20 cash forecasts for the Houbigant royalty were false and concealed the existence and terms of the Second Deferral at the time they caused the forecasts to be provided to the Zohar Funds, and did so in order to induce the Zohar Funds to provide loans.

32.     Sherman and Houbigant were fully aware that Cohen and/or Zamarelli planned to deceive the Zohar Funds about IMG's chronic payment defaults and the Second Deferral, yet conspired with them and aided and abetted their wrongful conduct.  On May 20, 2005, Zamarelli discussed with John Schryber, an attorney for Houbigant and Sherman, precisely how the Second

Deferral would be hidden from the lenders crafting the timing and language of a "good standing" so as to hide the Second Deferral. Zamarelli wrote an email on May 23 summarizing her conversation with Schryber: "I think we just need Houbigant to say that under the terms of our agreement (don't specify second deferral agreement), we are in compliance as of this date. Based on my conversation with John [Schryber] Friday, this is fine with him; he knows that we don't want to necessarily disclose the restructure fee since it wasn't in the first deferral agreement and he understood completely. He even said that he would prepare a letter subsequent to executing the second deferral but before the 25th when the May payment to is due to ensure that we would be in compliance with the agreement."

33.     Later on May 23, Schryber sent the draft text of good standing letter to Alfred Cowger, a Dana executive, for approval. And then, as planned, after Houbigant executed the Second Deferral on or before May 23, Schryber wrote the lenders a letter dated May 24, 2005, stating: "[Houbigant], by Licensor's undersigned counsel, certifies, consents and agrees, in favor of any secured lender of IMG Fragrance Brands LLC ("Licensee"), that the license agreement between Licensor and Licensee is in full force and effect, and no default in the performance of any of the covenants or the terms and conditions under said license agreement is known by Licensor to exist as of the date hereof."

34.     This good standing letter was patently false and grossly misleading in that it falsely represented that Houbigant did not know of any default in IMG's performance under the License Agreement, despite IMG's chronic defaults, and made no mention of the existence or terms of the unauthorized amendment.

35.     Cohen, Zamarelli, Sherman, and Houbigant possessed superior knowledge about the status of IMG's compliance; only they and their agents knew about the secret unauthorized

amendment and the circumstances relating thereto.  Cohen, Zamarelli, Sherman, and Houbigant knew that the Zohar Funds and the lenders were acting on their understanding that IMG was in good standing under the License Agreement and were without any knowledge of the unauthorized Second Deferral.  But for defendants' assistance in the fraud, the Zohar Funds would not have been induced to become lenders to Dana.

36.     Cohen and/or Zamarelli thereafter continued to conceal and misrepresent material facts concerning the License Agreement to prevent the Zohar Funds from foreclosing on the loans and to induce them to provide additional financing.

37.     Unbeknownst to the lenders, as early as June 2006, Sherman and Houbigant were already conspiring with Cohen and/or Zamarelli to yet again defer certain royalty payments, initially for three months, then for sex months, through a series of unauthorized amendments, which also called for additional onerous fees and/or interest.  Cohen and/or Zamarelli, Sherman, and Houbigant hatched a scheme to conceal their secret agreement by claiming to the lenders that these royalties had been forgiven—not deferred.  Through this scheme, Cohen and/or Zamarelli sought to paint a positive financial picture for the fiscal year ending March 31, 2006, as well as show compliance with certain EBITDA covenants required under the loan agreements.

38.     Beginning in July 2006 and through the fiscal year ending March 31, 2007, Zamarelli sent the Zohar Funds and other lenders false financial statements on a monthly basis reflecting a positive $525,000 difference between the month-to-date and year-to-date plan as compared to the prior year—matching the exact amount that Houbigant had purportedly forgiven for that period.

39.     Notwithstanding Cohen and/or Zamarelli's efforts to cook the books, the Dana borrowers breached a covenant of the financing agreements as of July 2006 and Zamarelli sought

a waiver of the default in September 2006.  When questioned further in connection with the

default, Zamarelli told and caused others to tell CapitalSource, an agent for the lenders, that

Houbigant had forgiven certain royalties because of low sales of the licensed products.  Rather

than declaring a default or foreclosing on the loans, the lenders agreed to waive the default so

long as IMG obtained evidence that three months of royalty payments for the first three months

of the fiscal year ending March 31, 2007 (*i.e.*, April through June 2006) had been forgiven.

40.     Sherman and Houbigant substantially assisted Cohen and/or Zamarelli's fraud by

entering into an unauthorized Third Deferral purporting to document the forgiveness of six

months of royalties.  However, as discussed above, they also executed a sham Consulting

Agreement and a Product Development and Marketing Agreement under which Dana agreed to

pay the exact amount of royalty payments purportedly forgiven—$1,050,000—as "consulting

fees" for services that were never to be performed.   That these were merely "converted" deferral

payments, in the words of Houbigant's counsel, is further reflected in a final balloon payment

under each of those agreements accounting for interest due on the deferred royalties.

41.     Houbigant obviously did not seek the prior written consent of the lenders before

executing the Consulting Agreement and a Product Development and Marketing Agreement.

Sherman and Houbigant knew that disclosure of these agreements would make transparent that

they had not, in fact, forgiven any royalties, but rather had imposed greater unauthorized

liabilities on the Dana business.  They knew there was no consideration for the sham agreements

since they provided no services of any kind.  These sham agreements had no legitimate purpose

and were intended to and did operate a fraud on the lenders.

42.     In an October 1, 2006 email to Cohen, Zamarelli admitted that the unauthorized

agreements were being deliberately concealed from the lenders and that Cohen and/or Zamarelli

were cooking the books to avoid detection.  Zamarelli wrote: "Timebombs ahead; we've masked so much to buy more time that I don't even know if I can remember everything. . . . Houb consulting fee another 88K a month to cover EBITDA wise . . . ."  Concerned that "[i]f the bank finds the 'new' consulting expense (remember they require trial balances at the field exams so they will) and if they see it's to Houbigant they will see right through what we did regarding the 'forgiveness'," Zamarelli proposed "talk[ing] to [Sherman] about wiring [the "consulting fee"] to another account at his direction."

43.     In their effort to conceal their secret arrangements with Sherman and Houbigant, Cohen and/or Zamarelli repeatedly made false and misleading statements.  For example, Zamarelli executed a compliance certificate dated January 2, 2007, representing, among other things, that none of the Dana borrowers or guarantors had "[f]ailed to pay when due any amounts owing under, or otherwise failed to comply with any of the terms of, the Houbigant License Agreement" and caused the compliance certificate to be sent to the Zohar Funds and the other lenders the following day.  At the time Zamarelli made this statement and caused it to be sent, she knew this was false.

44.     Each deception necessitated further deceptions, and in April 2007, during Cohen's negotiations with the lenders for a loan restructuring, Sherman and Houbigant again executed seven new unauthorized agreements, which purported to amend the License Agreement and impose additional liabilities on IMG, including $700,000 in deferral fees alone.  Sherman and Houbigant did not seek written consent of the lenders before executing these agreements, nor did they notify the lenders of IMG's chronic payment defaults or provide them an opportunity to cure the defaults.

45.     Sherman and Houbigant knew that these documents were false and invalid. Sherman and Houbigant had been alternatively threatening and negotiating with Cohen and/or Zamarelli for months to obtain past due payments, even issuing a default notice on January 3, 2007.  Notwithstanding its actual knowledge of IMG's default, Sherman and Houbigant purported to paper over the default with a Fourth Deferral Agreement.  The Fourth Deferral was intentionally backdated many months to November 2006 to create the false impression, if it were ever discovered, that IMG had not been in default.  They also backdated four deferral fee agreements to various times in 2005 and 2006 in a futile effort to bolster the appearance of their validity.

46.     Sherman knew that Cohen and/or Zamarelli were actively concealing the unauthorized agreements and misrepresenting IMG's compliance under the License Agreement. For example, on April 25, 2007,  Zamarelli sent Houbigant's counsel, Schryber, a mark-up of the Fourth Deferral and requested deletions of the words "past due" noting that "this agreement is dated 11.3.06 and can't be past due," and "request[ing] the statement that a default doesn't 'exist' as of this date."  Zamarelli also asked to "take out" any reference to the backdated deferral fee agreements because "they don't want these fees disclosed to third parties" and to the sham Consulting and Product Development Agreements because "third parties are not aware of the two 'other' agreements".

47.     Compounding their wrongful conduct, Sherman and Houbigant also executed an Amended Consulting Agreement and an Amended Product Development and Marketing Agreement, each dated April 27, 2007, which purported to affirm that defendants had "fully performed" under the sham agreements even though Houbigant had not provided a single service.

48.     Notably, this sham amended agreement set a deferred schedule of payments to begin in September 2007, after the 2007 loan restructurings were to occur, in an apparent effort to avoid detection. Sherman took further steps to aid in the concealment. Taking Zamarelli's earlier suggestion to mask the payments to Houbigant under the Consulting and Product Development Agreements, he provided a new bank account through which payments could be funneled. On June 4, 2007, Sherman sent wire instructions to Zamarelli and James Berger, a Dana executive, for Round Table Acquisitions, LLC, the "second bank account [Zamarelli] asked for." The next day, Berger confirmed that certain payments "will be hitting the bank account we have been using in the past," but that "[t]he commencing of the payments for the Product Development and Marketing Agreement, on September 1st, will then be hitting the account you recently provided."

49.     The Zohar Funds and other lenders never knew – nor could they have known – about the agreements that Cohen and the defendants had secretly entered into, the additional liabilities IMG purportedly owed to Houbigant, the true status of IMG's defaults, or the connection between Round Table Acquisitions LLC and Sherman. In addition, Cohen and/or Zamarelli continued to make misrepresentations designed to keep these agreements hidden. For example, they caused monthly compliance certificates to be issued and provided to the lenders that denied the existence of any event or condition that constitutes a default. Beginning in August 2007, they also caused monthly executive summaries of the financial statements to be prepared affirming that IMG had received "a one-time royalty forgiveness." And in or about October 2007, Cohen and/or Zamarelli caused the auditors of the Dana business to provide the Zohar Funds false audited statements that confirmed that "[f]or each of the years ended March 31, 2007 and 2006, Houbigant waived three months of royalty payments totaling $525,000."

50.     Cohen, Sherman and Houbigant knew that the Zohar Funds and the lenders were acting on the basis of mistaken knowledge that IMG was in good standing under the License Agreement and that the terms of the License Agreement had not been purportedly amended.  But for Sherman and Houbigant's assistance and complicity in Cohen's and Zamarelli's fraudulent scheme, the Zohar Funds and the other lenders would have foreclosed on the loans, and would not have restructured the Dana loans or have provided additional loans.

**The Zohar Funds Obtain Ownership of IMG Holdings**

51.     The borrowers under the loan agreements were due to make a monthly interest payment on October 1, 2008, and they did not do so.  The lenders responded by issuing a default notice and acceleration letter, dated October 10, 2008, which rendered the full amount of the loans immediately due and owing.  On October 17, 2008, the Zohar Funds restructured and partially foreclosed on the loans.  In exchange for withdrawing that exercise of the lenders' rights to full acceleration, Cohen contributed to the Zohar funds 75% of the stock in IMG Holdings.  As of October 2008, IMG Holdings' balance sheet showed a substantially negative EBITDA and the lenders' equity in Dana carried a negative value.

52.     Since October 2008, the Dana borrowers owe past due amounts in interest.  None of the approximately $40 million in total loans by the Zohar Funds have been repaid, including loans with an original maturity date in May 2009.  On May 4, 2009, the Zohar Funds issued a notice of default for payment defaults and for breach of various covenants, including Cohen and/or Zamarelli's entry of the various unauthorized agreements purporting to amend the License Agreement without prior written lender consent—agreements that the Zohar Funds discovered only in connection with their acquiring control of the Dana business.  The Dana borrowers are in default on at least $11 million of loans and the Zohar Funds have been forced to foreclose on a

portion of the loans at a loss.  As of October 2009, the rating agencies have assessed a recovery rate on the loans of between 50 and 60 percent.

**IMG Exercises Its Purchase Option**

53.     The License Agreement expired by its terms on December 31, 2008.  At that point, IMG and the Zohar Funds had the right, for 30 days thereafter, to purchase the licensed trademark and other rights for $1,000, plus any outstanding royalties.  Likewise, by virtue of the Licensor's Consent agreements, the lenders had the right to notice and an opportunity to cure any alleged default arising from the unpaid royalties.

54.     Both IMG and the Zohar Funds exercised these rights by twice tendering to Houbigant an amount of money representing the outstanding royalties owed, and the $1,000 purchase price.  IMG and the Zohar funds specifically asked Houbigant, if it believed the amount to be too little, to supply its own calculation and a short explanation for it.  Houbigant refused both tenders and further refused to supply its own calculation of what amount was owed.  In fact, Houbigant took the position that IMG no longer had *any* right to the purchase option.

55.     At no time prior to this litigation, or since, has Houbigant informed IMG or the Zohar Funds of the amount it believes would satisfy the price owed under the purchase option.

### COUNT I—DECLARATORY JUDGMENT
### (OWNERSHIP OF THE TRADEMARK RIGHTS)

**(IMG and the Zohar Funds v. Houbigant)**

56.     All previous allegations are incorporated herein.

57.     IMG and the Zohar Funds validly exercised their rights under the License Agreement and the 2004 Collateral Assignments to the License Agreement and 2007 Collateral Assignments to the License Agreement to purchase the licensed trademark rights.

58.     There is an actual controversy between the parties because Houbigant has refused to accept IMG's and the Zohar Funds' tenders and wrongly maintains that it continues to own the trademarks and related rights.

59.     IMG and the Zohar Funds are entitled to a judicial declaration that IMG is the equitable and lawful owner of the trademarks and related rights.

## COUNT II—BREACH OF CONTRACT
## (LICENSE AGREEMENT)

### (IMG v. Houbigant)

60.     All previous allegations are incorporated herein.

61.     Houbigant breached the License Agreement by failing to sell the licensed rights as required under Section 9(e) of the License Agreement.

62.     Houbigant also breached the implied duty of good faith and fair dealing by refusing to accept IMG's tenders and further refusing to notify IMG of what it considered to be the appropriate purchase price under the License Agreement.

63.     IMG is therefore entitled to specific performance, *i.e.*, a judicial order requiring Houbigant to formally assign the trademark rights to IMG as set forth in the License Agreement.

## COUNT III—DECLARATORY JUDGMENT
## (UNAUTHORIZED AGREEMENTS)

### (IMG, Dana and the Zohar Funds v. Houbigant)

64.     All previous allegations are incorporated herein.

65.     All of the agreements in paragraph 19, as well as any agreements executed in connection therewith, were executed without prior written lender consent as required under both the 2004 Collateral Assignment of License Agreement and the 2007 Collateral Assignment of License Agreement.

66.     All of these agreements are void, invalid, and ineffective, and IMG, Dana and the Zohar Funds are entitled to a judicial declaration to that effect.

## COUNT IV—AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY

### (IMG Holdings, IMG, and Dana v. Houbigant and Sherman)

67.     All previous allegations are incorporated herein.

68.     Cohen and/or Zamarelli breached their fiduciary duties to the various Dana entities they managed by entering into the unauthorized agreements in paragraph 19 and by concealing from the lenders the existence of these agreements, any alleged defaults that may have engendered them, and the additional liabilities purportedly owed.

69.     Houbigant and Sherman knew that IMG was not authorized to amend the License Agreement and could not enter the Consulting and Product Development Agreements without the express written consent of the lenders when Houbigant executed the unauthorized agreements.

70.     By entering into the unauthorized agreements, Sherman and Houbigant substantially assisted Cohen's and/or Zamarelli's breaches of fiduciary duty so as to derive more profit from the License Agreement than was permissible under that Agreement and the various financing agreements.  Sherman's and Houbigant's conduct is the direct and proximate cause of financial harm to IMG Holdings, IMG, and Dana.

71.     IMG Holdings, IMG, and Dana are therefore entitled to damages caused by this wrongful conduct, in an amount to be determined at trial, plus any other relief the Court deems just and proper.

## COUNT V—AIDING AND ABETTING FRAUD

### (The Zohar Funds v. Sherman and Houbigant)

72.    All previous allegations are incorporated herein.

73.    Sherman and Houbigant knew that IMG was not authorized to amend the License Agreement and could not enter the Consulting and Product Development Agreements without the express written consent of the lenders.  Sherman and Houbigant knew Cohen and/or Zamarelli were deceiving the Zohar Funds and the other lenders about IMG's compliance under the License Agreement and financing agreements and concealing from them the unauthorized agreements in paragraph 19, in order to enable Cohen to maintain control over the Dana entities and induce the Zohar Funds and the other lenders to provide loans to the Dana entities.

74.    The correct information about IMG's compliance and the existence and terms of the unauthorized agreements, secretly entered into by Sherman, Cohen and/or Zamarelli, was peculiarly within the knowledge of Sherman, Cohen and/or Zamarelli and was not available to the Zohar Funds.

75.    Sherman and Houbigant provided substantial assistance to advance the commission of Cohen's and/or Zamarelli's fraud, by, among other things, submitting a highly misleading "good standing" letter to the lenders that deliberately failed to mention IMG's chronic payment defaults and the Second Deferral, entering into sham "consulting" agreements so that Houbigant could be fully paid over $1 million in royalty payments that the lenders were falsely told were "forgiven," backdating agreements to conceal from the lenders IMG's defaults, and providing IMG a bank account in the name of an entity, Round Table Acquisitions LLC, that would mask the true recipient, Houbigant.

76.     Sherman and Houbigant aided and abetted Cohen's and/or Zamarelli's fraud against the Zohar Funds so as to derive more profit from the License Agreement than was permissible under that Agreement and the various financing agreements.  Sherman's and Houbigant's conduct is the direct and proximate cause of financial harm to the Zohar Funds.

77.     The Zohar Funds, on their own behalf and as successors to other lenders, are therefore entitled to damages caused by this wrongful conduct in an amount to be determined at trial, plus any other relief the Court deems just and proper.

## COUNT VI—CIVIL CONSPIRACY

**(IMG Holdings, IMG, Dana, and the Zohar Funds v. Sherman and Houbigant)**

78.     All previous allegations are incorporated herein.

79.     Sherman and Houbigant conspired with Cohen and/or Zamarelli to defraud the lenders.  The conspiracy had the dual corrupt purpose of enabling Cohen and/or Zamarelli to maintain control of the Dana businesses for their personal benefit and to enable Houbigant to extract payments that were otherwise unauthorized.

80.     In furtherance of the conspiracy, Sherman, Houbigant, Cohen, and/or Zamarelli conspired to make false and/or misleading statements to the lenders and concealed from the lenders the existence of these agreements, any alleged defaults that may have engendered them, and the additional liabilities purportedly owed.  Together they conspired to, among other things, submit highly misleading "good standing" letter to the lenders that deliberately failed to mention IMG's chronic payment defaults and the Second Deferral, enter into sham "consulting" agreements so that Houbigant could be fully paid over $1 million in royalty payments that the lenders were falsely told were "forgiven,"  backdate agreements to conceal IMG's defaults, and

mask payments made to Houbigant by using a bank account in the name of an entity, Round Table Acquisitions LLC.

81.     IMG, Dana, and the Zohar Funds, on their own behalf and as successors to other lenders, are therefore entitled to damages caused by this wrongful conduct in an amount to be determined at trial, plus any other relief the Court deems just and proper.

## COUNT VII—BREACH OF CONTRACT
## (2004 COLLATERAL ASSIGNMENT OF LICENSE AGREEMENT)

### (The Zohar Funds v. Houbigant)

82.     All previous allegations are incorporated herein.

83.     Houbigant breached the 2004 Collateral Assignment of License Agreement when it entered into the unauthorized agreements in paragraph 19, as well as any other agreements executed in connection therewith.  Houbigant's breach of the 2004 Collateral Assignment is the direct and proximate cause of financial harm to the Zohar Funds.

84.     The Zohar Funds, on their own behalf and as successors to other lenders, are therefore entitled to damages caused by this wrongful conduct in an amount to be determined at trial, but no less than the additional amounts Houbigant extracted or claim are due under the unauthorized agreements, plus any other relief the Court deems just and proper.

## COUNT VIII—TORTIOUS INTERFERENCE
## (2004 COLLATERAL ASSIGNMENT OF LICENSE AGREEMENT)

### (The Zohar Funds v. Houbigant)

85.     All previous allegations are incorporated herein.

86.     In the alternative to Count VII, Houbigant knew and acknowledged to the lenders that IMG was contractually required by the 2004 Collateral Assignment of License Agreement to obtain written consent before it entered into the agreements in paragraph 19, as well as any other

agreements executed in connection therewith. IMG breached the 2004 Collateral Assignment when it entered into the unauthorized amendments without prior written consent.

87.    Houbigant knowingly and intentionally interfered with that contract without reasonable justification so as to derive more profit from the License Agreement than was permissible under that Agreement and the various financing agreements. Houbigant's tortious interference with the 2004 Collateral Assignment is the direct and proximate cause of financial harm to the Zohar Entities.

88.    The Zohar Funds, on their own behalf and as successors to other lenders, are therefore entitled to damages caused by this wrongful conduct in an amount to be determined at trial, plus any other relief the Court deems just and proper.

**COUNT IX—BREACH OF CONTRACT**
**(2007 COLLATERAL ASSIGNMENT OF LICENSE AGREEMENTS)**

**(Zohar II and Zohar III v. Houbigant)**

89.    All previous allegations are incorporated herein.

90.    Houbigant breached the 2007 Collateral Assignment of License Agreement when it entered into the Fifth Deferral Agreement and the Second Amended Consulting and Product Development Agreement.

91.    Houbigant's breach of the 2007 Collateral Assignment is the direct and proximate cause of financial harm to Zohar II and Zohar III.

92.    Zohar II and Zohar III, on their own behalf and as successors to Wells, are therefore entitled to damages caused by this wrongful conduct in an amount to be determined at trial, but no less than the additional amounts Houbigant extracted or claim are due under the unauthorized agreements, plus any other relief the Court deems just and proper.

## COUNT X—TORTIOUS INTERFERENCE
## (2007 COLLATERAL ASSIGNMENT OF LICENSE AGREEMENTS)

### (Zohar II and Zohar III v. Houbigant)

93.     All previous allegations are incorporated herein.

94.     In the alternative to Count IX, Houbigant knew and acknowledged to the lenders that IMG was contractually required by the 2007 Collateral Assignment of License Agreement to obtain written consent before it entered into the agreements in paragraph 19, as well as any other agreements executed in connection therewith.  IMG breached the 2007 Collateral Assignment when it entered into the unauthorized amendments without prior written consent.

95.     Houbigant knowingly and intentionally interfered with that contract without reasonable justification so as to derive more profit from the License Agreement than was permissible under that Agreement and the various financing agreements.  Houbigant's tortious interference with the 2007 Collateral Assignment is the direct and proximate cause of financial harm to the Zohar Entities.

96.     The Zohar Funds, on their own behalf and as successors to Wells, are therefore entitled to damages caused by this wrongful conduct in an amount to be determined at trial, plus any other relief the Court deems just and proper.

## COUNT XI—BREACH OF CONTRACT
## (2004 LICENSOR'S CONSENT TO THE LICENSE AGREEMENT)

### (The Zohar Funds v. Houbigant)

97.     All previous allegations are incorporated herein.

98.     Houbigant breached the 2004 Licensor's Consent to the License Agreement each time it failed to provide the lenders notice and an opportunity to cure IMG's defaults and instead

demanded payments from IMG and entered into the unauthorized agreements in paragraph 19, as well as any other agreements executed in connection therewith.

99.   Houbigant's breach of the 2004 Licensor's Consent is the direct and proximate cause of financial harm to the Zohar Funds.

100.   The Zohar Funds, on their own behalf and as successors to other lenders, are therefore entitled to damages caused by this wrongful conduct, in an amount to be determined at trial, but no less than the additional amounts Houbigant extracted or claim are due under the unauthorized agreements, plus any other relief the Court deems just and proper.

## COUNT XII—BREACH OF CONTRACT
### (2007 LICENSOR'S CONSENT TO THE LICENSE AGREEMENT)

### (Zohar II an Zohar III v. Houbigant)

101.   All previous allegations are incorporated herein.

102.   The 2007 Licensor's Consent to the License Agreement was a valid and enforceable contract.  Houbigant breached the 2007 Licensor's Consent when it failed to provide the lenders notice and an opportunity to cure IMG's defaults and instead demanded payments from IMG and entered into the Fifth Deferral and the Second Amended Consulting and Product Development Agreement.

103.   Houbigant's breach of the 2007 Licensor's Consent is the direct and proximate cause of financial harm to Zohar II and Zohar III.

104.   Zohar II and Zohar III, on their own behalf and as successors to Wells, are therefore entitled to damages caused by this wrongful conduct in an amount to be determined at trial, but no less than the additional amounts Houbigant extracted or claim are due under the unauthorized agreements, plus any other relief the Court deems just and proper.

- 27 -

## <u>PRAYER FOR RELIEF</u>
## <u>AND DEMAND FOR JURY TRIAL</u>

WHEREFORE, plaintiffs hereby demand a trial by a jury and judgment against defendants as follows:

(a)   A judicial declaration that IMG is the equitable and lawful owners of the trademarks and related rights that were the subject of the License Agreement;

(b)   An Order requiring Houbigant to formally assign the trademark rights to IMG as set forth in the License Agreement;

(c)   Damages caused by the defendants' civil conspiracy, breaches of contract or alternatively tortious interference with contract, aiding and abetting of the breaches of fiduciary duty by Cohen and Zamarelli, aiding and abetting of fraud by Cohen and Zamarelli

(d)   Plaintiffs' costs, expenses, and attorneys' fees incurred in connection with this action to the maximum extent permitted by law; and

(e)   Such other and further relief as the Court may deem appropriate.

Date:   New York, New York
        February 5, 2010

Respectfully submitted,

By: _____
George Mahfood (GM-0578)
BROAD AND CASSEL
One Biscayne Tower, 21st Floor
2 S. Biscayne Blvd.
Miami, Fl 33131
Tel: (305) 373-9427
Fax: (305) 995-6437

*Counsel for plaintiffs IMG Fragrance
Brands LLC, IMG Holdings, Inc. and
Dana Classic Fragrances, Inc.*

By: _____
Hillary Richard (HR-6941)
Charles Michael (CM-0303)
BRUNE & RICHARD LLP
80 Broad Street
New York, New York 10004
Tel:  (212) 668-1900
Fax:  (212) 668-0315

*Counsel for plaintiffs
Zohar CDO 2003-1, Limited, Zohar II
2005-1 Limited and Zohar III Limited*