UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
IMG FRAGRANCE BRANDS, LLC,            :
DANA CLASSIC FRAGRANCES, INC.,        :
ZOHAR CDO 2003-1 LIMITED, ZOHAR II    :
2005-1 LIMITED, ZOHAR III LIMITED,    :
and IMG HOLDINGS, INC.,               :
                                      :
                    Plaintiffs,       :
                                      :     09 CV 3655 (LAP)
          v.                          :
                                      :     OPINION AND ORDER
HOUBIGANT, INC., ETABLISSEMENT        :
HOUBIGANT, and MICHAEL J. SHERMAN,    :
                                      :
                    Defendants.       :
----------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/17/10

LORETTA A. PRESKA, Chief United States District Judge:

## 1. Introduction

     This case arises out of a dispute among Plaintiffs IMG

Fragrance Brands, LLC; IMG Holdings, Inc.; Dana Classic

Fragrances and Defendants Houbigant, Inc.; Etablissement

Houbigant and Michael J. Sherman over the ownership of certain

fragrance trademarks that were licensed by Houbigant to IMG

Fragrance Brands, LLC.  Plaintiffs allege breach of certain

agreements made in connection with the licensing agreement of

the fragrance trademark license (the "Licensing Agreement") as

well as tortious interference with contract, aiding and abetting

fraud, aiding and abetting breach of fiduciary duty, and civil

conspiracy.

On April 1, 2010, Plaintiffs filed an amended complaint, which Defendants now move to dismiss, except for Count II, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Prior to the present motion to dismiss, the Court granted in part, and denied in part, Plaintiffs' motion to dismiss Houbigant's various counterclaims arising out of the alleged breach of the Licensing Agreement.  See IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395 (S.D.N.Y. 2009).

For the reasons discussed herein, Defendants' motion to dismiss is granted in part and denied in part.

    2.  Background

        a.  The Parties

Defendants Houbigant, Inc. and Etablissement Houbigant (collectively, "Houbigant") are engaged in the business of licensing fragrance product trademarks.  See id. at 399. Defendant Michael J. Sherman ("Sherman," and together with Houbigant, "Defendants") is an officer of Houbigant.  (Compl. ¶ 6.)  Houbigant licensed to Plaintiff IMG Fragrance Brands, LLC ("IMG Brands"), a wholly owned subsidiary of Plaintiff IMG Holdings, Inc. ("IMG Holdings" together with IMG Brands, "IMG"), certain fragrance product trademarks pursuant to the License Agreement dated December 19, 2003.  IMG, 679 F. Supp. 2d at 400.

2

Plaintiff Dana Classic Fragrances, Inc. ("Dana"), a subsidiary
of IMG Holdings that manufactures and promotes various fragrance
products, is a sub-licensee of IMG Brands.  (First Amended
Complaint ("FAC") ¶ 2.)  Plaintiff Zohar CDO 2003-1 Limited
("Zohar I"), Zohar II 2005-1 Limited ("Zohar II"), and Zohar III
Limited ("Zohar III," and together with Zohar I and Zohar II,
the "Zohar Funds," and collectively with IMG and Dana,
"Plaintiffs") are private equity funds with each holding the
following percentage of IMG Holdings' stock: Zohar I-13%; Zohar
II-51%; and Zohar III-11%.  IMG, 679 F. Supp. 2d at 400.

### b.  The License Agreement

On December 19, 2003, Houbigant entered into the License
Agreement with IMG Brands whereby IMG Brands, as Licensee, was
given an exclusive license to various trademarks.  (See FAC ¶ 1;
Declaration of Todd Harrison "Harrison Decl." Ex. L.)  IMG sub-
licensed the License Agreement to Dana.  (FAC ¶ 11.)  In the
License Agreement, IMG had the right to purchase the licensed
trademarks at the end of the five-year license term, for $1,000
plus any unpaid royalties. (See id.; Harrison Decl. Ex. L §
9(e).)

At the expiration of the License Agreement, IMG had not
paid all royalties contemplated under the License Agreement.
(FAC ¶ 1.)  IMG and its secured lenders twice attempted to

purchase the trademarks by tendering to Houbigant the

outstanding royalties, plus $1000, but Houbigant did not accept

payment. (Id.; Pl. Opp'n Mem. at 1.)

### c. Loan and Assignment History

After the parties entered into the License Agreement, in

September 2004, IMG, Dana, and affiliates entered into a secured

loan agreement with Congress Financial Corporation ("Congress")

and two other lenders (the "2004 Loan Agreement").  (FAC ¶ 12;

Pl. Opp'n Mem. at 3.)  Congress was the designated "Agent" for

the "Lenders" under the 2004 Loan Agreement.  (FAC ¶ 13.)  The

2004 Loan Agreement defined "Lenders" as the three signatory

lenders and "their respective successors and assigns."

(Harrison Decl. Ex. G § 1.81.)  Under that agreement, IMG and

Dana were prohibited from cancelling, surrendering, modifying,

amending, waiving, or releasing any term, provision, or right

under any "License Agreement," including the Houbigant license.

(Id. §§ 9.22, 8.11; Declaration of Charles Michael "Michael

Decl." Ex. 1 § 2.)  IMG and Dana were also prohibited from

amending "certain material contracts" purported to be listed on

4

Schedule 1.88, without the prior consent of the Agent, which was

Congress.[1]   (Harrison Decl. Ex. G § 9.26.)

Two weeks before the closing of the 2004 Loan Agreement,

Houbigant, IMG, and Congress executed a "Licensor Consent"

agreement by which Houbigant agreed to give the Agent, notice of

IMG's default, if any, and an opportunity to cure the default.

(Id. Ex. K § 3.)  By its language, the provision requires

written notice of any event "which Licensor claims would

constitute a default by Licensee under the License Agreement."

(Id.)  Further, the Licensor Consent provided that it could be

"assigned by the Agent to any transferee or participant . . . in

---

[1] Although there is no Schedule 1.88 attached to the 2004 Loan
Agreement, Schedule 1.87 is titled "Specified Material
Contracts."  Schedule 1.87 lists the Houbigant License Agreement
as a "material contract." (See Harrison Decl. Ex. G, Sch. 1.87.)
Defendants argue that as there is no Schedule 1.88, the 2004
Loan Agreement did not "require prior written consent for
amendments to any Material Contracts, including the [Houbigant]
license." (See Memorandum in Support of Houbigant's Motion to
Dismiss at 6 ("Houb. Mem.").)  The Court rejects this argument.
There was a typographical error in the title of that Schedule.
Cf. Nat'l Am. Corp. v. Nigeria, 597 F.2d 314, 320-21 (2d Cir.
1979) (finding an "obvious typographical error" and rejecting
argument that agreement was ambiguous and inaccurate).  This
conclusion is bolstered by the inclusion of language in the
"Compliance Certificate," attached to the 2004 Loan Agreement,
which the borrower must submit each month certifying that no
borrower or guarantor has "[f]ailed to pay when due any amounts
owning under, or otherwise failed to comply with any of the
terms of, the Houbigant License agreement or any of the other
agreements listed on Schedule 1.88 . . . ." (Harrison Decl. Ex.
G, Ex. C § 4(g) (emphasis added).)

the [2004] Loan Agreement or to any financial institution or
other entity which refinances . . . or purchases the [loans]
from Agent and Lenders or assumes Agents' and/or Lenders' rights
and obligations under the Loan Agreement." (Id. § 6.)

Attached to the Licensor Consent was the "Collateral
Assignment," which assigned to Congress, as Agent for the
Lenders, all of IMG's rights under the License Agreement, to be
exercised only if IMG failed to fulfill its obligations under
the 2004 Loan Agreement.  (See id. § 7; id. Ex. B.)  The
Collateral Assignment, signed by Congress, IMG, and Houbigant,
also stated that IMG was required to obtain the written consent
of Congress, as Agent, before amending or modifying the
Houbigant License Agreement or agreeing to "any amendment,
renewal, release, acceptance, forbearance, modification or
waiver with respect to any rights arising under the License
Agreement." (Id. Ex. B.)  The Collateral Assignment was to
"inure to the benefit of Assignee and Lenders and each of their
successors and assigns." (Id.)

The 2004 Loan Agreement was executed on September 30, 2004
and contained an integration clause stating that the entire
agreement consisted of "[t]his agreement, the other Financing
Agreements, any supplements hereto or thereto, and any
instruments or documents delivered or to be delivered in

6

connection herewith or therewith . . . ."  (Id. Ex. G § 13.9.)
Both the Licensor Consent and the Collateral Assignment were
included in the 2004 Loan Agreement execution documents (the
"Closing Documents").  (Michael Decl. Ex. 3 at 10-11.)

        In March 2005, Congress merged with its parent company,
Wachovia, thereby replacing Congress as "Agent" for all
"Financing Agreements," including the 2004 Loan Agreement and
all documents and agreements delivered "in connection with" it.
(Harrison Decl. Ex. G § 1.57; Ex. J § 1(b)(iii); Michael Decl.
Ex. 2.)  Amendment No. 1 and Waiver to Loan and Security
Agreement was executed in May 2005 wherein Zohar I and Zohar II
became "Term Loan Lenders" by assignment, and Patriarch Partners
Agency Services, LLC ("Patriarch") became the "Term Loan Agent."
(See Harrison Decl. Ex. J §§ 1(a)(xv), 2.3, Sch. 1.; Ex.
G § 1.143-1.144.)   Wachovia later assigned its interest in the
2004 Loan Agreement to CapitalSource, LLC ("CapitalSource") as
part of the Amended and Restated Loan and Security Agreement,
executed on June 2, 2006.  (Michael Decl. Ex. 4 at 2.)  Wachovia
assigned to CapitalSource "all of [its] rights, authorities and
powers" as Agent under the 2004 Loan Agreement and "the other
Financing Agreements."  (Id. Ex. 6 § 2(b).)

        In April 2007, CapitalSource assigned to Patriarch all of
its "rights, authority, duties and powers" under the "Financing

Agreement" as Agent and assigned all of the loans under that
agreement to Zohar III.  (Michael Decl. Ex. 8; Ex. 9 §§ 1, 2.)

On June 28, 2007, the parties executed the Second Amended
and Restated Loan and Security Agreement. (Id. Ex. 10.)  As of
the execution of that document, the lenders with rights under
the 2004 Loan Agreement were Zohar I and Zohar II, with
Patriarch as Agent.[2]  (See id. at PAT00007099.)

Also on June 28, 2007 Wells Fargo Foothills, Inc. ("Wells")
entered into a Credit Agreement with the Dana and IMG but for a
separate set of loans (the "2007 Loan Agreement").  (Harrison
Decl. Ex. W.)  Just as in the 2004 Loan Agreement, IMG was
prohibited from cancelling, surrendering, modifying, amending,
waiving, or releasing any material License Agreement in any
material respect.  (Id. Ex. W § 5.19(a).)  At the same time,
Wells, IMG, and Houbigant executed a Licensor Consent and a
Collateral Assignment similar to the ones executed in connection
with the 2004 Loan Agreement in all material respects.  (Id. Ex.
O § 3; Michael Decl. Ex. 12.)

On December 31, 2008, Wells assigned all of its rights and
obligations under the 2007 Loan Documents, defined as including

---

[2] The parties agree that Zohar I and II are the lenders with
rights under the 2004 Loan Agreement.

8

"any other agreement entered into, now or in the future, by any Borrower . . . in connection with the Agreement," to Zohar II and III. (Harrison Decl. Ex. W Sch. 1.1; Michael Decl. Ex. 13.) In the same document, Wells assigned to Patriarch all of its rights and duties as Agent.  (See Michael Decl. Ex. 13 § 7.)

### d. Alleged Fraud and Misconduct

Plaintiffs allege that from 2005 until 2008, Defendants conspired with Isaac Cohen, IMG Holding's former sole shareholder, and Gina Zamarelli, a former IMG Holdings officer, to defraud the lenders and induce them into continuing to extend credit to IMG and/or to delay their foreclosure on the loans. (See Pl. Opp'n Mem. at 6-7; FAC ¶ 9.)  This was done by executing a series of agreements and amendments to the License Agreement, to which the lenders had not consented, that, among other things, purported to impose additional fees and interest on IMG and eliminate certain of IMG's rights under the License Agreement.  (FAC ¶¶ 21, 27; Pl. Opp'n Mem. at 6-7.)

These agreements (the "Unauthorized Agreements"), Plaintiffs allege, were in violation of the 2004 and 2007 Collateral Assignments, which required advance written consent before any amendment to the License Agreement, and the 2004 and 2007 Licensor Consents, which required written notice and an opportunity for the lenders to cure any default by IMG.  (FAC

9

¶¶ 20-21.)  The Unauthorized Agreements and amendments include: multiple deferral agreements, some of which were allegedly backdated, acknowledging undisclosed, missed royalty payments and associated "deferral fees"; a "sham" consulting agreement, which Houbigant allegedly entered to recoup "the exact amount of royalty payments" that had been reported to the lenders as "forgiven"; and an agreement that purported to eliminate IMG's right to cure defaults under the License Agreement.[3]  (See Pl. Opp'n Mem. at 7; FAC ¶ 19, 21-41.)  The Zohar Funds claim that had they known about these agreements or IMG's inability to make royalty payments they would have taken steps to protect their security interest in the License Agreement.  (FAC ¶ 22.)

Plaintiffs also allege that Defendants aided and abetted Cohen's and Zamarelli's fraud and breach of fiduciary duty and conspired with Cohen and Zamarelli to defraud the lenders.  (Id. ¶¶ 67-81.)  An example of this alleged misconduct was a "good standing" letter drafted by Houbigant's attorney at the request of Cohen and Zamarelli that allegedly misled the lenders regarding IMG's performance under the License Agreement and

---

[3] The agreements listed are not exhaustive.  The list is merely illustrative of the type and nature of the complained-of agreements.  Part 4, infra, will discuss the complained-of agreements in greater detail.

concealed from them the existence of a second deferral agreement, which increased IMG's financial liability to Houbigant. (Id. ¶¶ 32-34.)  Further, Plaintiffs allege that, at the request of Cohen and Zamarelli, Houbigant provided a bank account that was not in its name, to which the "sham consulting fee" would be routed, so as to conceal that agreement from the lenders. (Id. ¶ 42.)

### e. The Zohar Funds Take Control of IMG

In October 2008, Dana missed a loan payment, and the Zohar Funds issued an acceleration notice. (Id. ¶ 51.)  The Zohar Funds, however, withdrew the notice in exchange for acquisition of 75% of the stock of IMG and IMG Holding. (Id.)  Once the Zohar Funds took control of IMG, they discovered the Unauthorized Agreements with Houbigant. (Id. ¶ 52.)  According to Plaintiffs, shortly thereafter, the license expired, and IMG and the Zohar Funds twice attempted to purchase the trademarks from Houbigant by tendering the balance owing under the License Agreement, plus $1000. (Id. ¶ 54.)  However the deal was never completed because Houbigant refused to do so. (Id.)

### 3. Jurisdiction

The Court has diversity jurisdiction over the present case pursuant to 28 U.S.C. § 1332.  The parties have assumed that New

York State law governs Plaintiffs' claims, and the Court has no reason to disagree.

This Court has jurisdiction over the present claims pursuant to 28 U.S.C. § 1367(c).  Although no federal claims remain, in its discretion, the Court retains jurisdiction over the remaining state-law claims.  The claims do not raise any complex or novel issues of state law and can be easily resolved by this Court.  See Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003).  Further, in the interest of judicial economy and convenience, the Court finds that it is most efficient to retain jurisdiction over the case and resolve the present motion.

### 4. Discussion

This Part will first discuss the legal standard governing motions to dismiss.  Then it will address Defendants' contention that the Zohar Funds do not have standing to assert their claims.  Finding that the Zohar Funds do have standing, this Part will detail Plaintiffs' breach of contract, tortious interference, and declaratory judgment claims arising under the 2004 and 2007 Collateral Assignments and Licensor Consents. Finally, it will address Plaintiffs' aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and civil conspiracy claims.

a. Legal Standard for a Motion to Dismiss Under
Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, --- U.S. ----, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." Id. at 557.

In Iqbal, the Supreme Court set forth a "two-pronged" approach for analyzing a motion to dismiss. 127 S. Ct. at 1950. First, a court must accept a plaintiff's factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor. Id. at 1949-50. The court may then proceed to identify "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 1950. Once the court has stripped away the conclusory allegations, it must determine whether the complaint's "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court

13

to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949 (citing Twombly, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. Evaluating the plausibility of a plaintiff's claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (citation omitted).

> b. The Enforceability of The 2004 Collateral Assignment

To consider Plaintiffs' claims under the 2004 Collateral Assignment, the Court must first address Defendants' contention that the 2004 Collateral Assignment was superseded by the closing of the 2004 Loan Agreement, which occurred two weeks after the 2004 Collateral Assignment was executed. (Compl. ¶ 12; Harrison Decl. Ex. B; Memorandum in Support of Houbigant's Motion to Dismiss ("Houb. Mem.") at 5.) Defendants argue that any agreement made prior to the closing of the 2004 Loan Agreement concerning the same subject matter was superseded by the 2004 Loan Agreement's integration clause. (Id.) That clause reads:

> This Agreement, the other Financing Agreements, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection

14

herewith or therewith represent the entire agreement
and understanding concerning the subject matter hereof
and thereof between the parties hereto, and supersede
all other prior agreements understandings,
negotiations and discussions, representations,
warranties, commitments, proposals, offers and
contracts concerning the subject matter hereof,
whether oral or written.  In the event of any
inconsistency between the terms of this Agreement and
any schedule or exhibit hereto, the terms of this
Agreement shall govern.

(Harrison Decl. Ex. D § 13.9.)

Defendants argue that the Collateral Assignment was superseded
because the 2004 Loan Agreement closed after it and because the
Collateral Assignment contemplated a closing of the Loan
Agreement on September 16, 2004.  (Houb. Mem. at 5.)  The Court
disagrees with Defendants' characterization of the Collateral
Assignment.

The 2004 Collateral Assignment was attached to the Licensor
Consent, which stated that as of September 16, 2004, IMG "has
entered into or is about to enter into" a loan agreement.
(Harrison Decl. Ex. K at 1 & § 7) (emphasis added).)  The
Licensor Consent also makes reference to the Collateral
Assignment attached to it.  (Id. § 7.)  Further, both the
Licensor Consent and the Collateral Assignment were included in
the Closing Documents for the 2004 Loan Agreement on September
30, 2004.  (Michael Decl. Ex. 3 at 10-11.)  Later, both the
Licensor's Consent and the Collateral Assignment were included

15

in a "Master Reaffirmation." (Michael Decl. Ex. 7 Recital C & Ex. A.) Thus, the Court finds that the 2004 Collateral Assignment was an "instrument or document . . . delivered in connection" with the 2004 Loan Agreement (Harrison Decl. Ex. D § 13.9) and therefore is not superseded by the 2004 Loan Agreement's integration clause.

### c. The Zohar Funds' Standing

Defendants next argue that the Zohar Funds lack standing because they were not parties to the License Agreement or other contracts at issue. (See Houb. Mem. at 1.) Defendants contend that the FAC only provides conclusory allegations of "successorship" to the 2004 and 2007 Collateral Assignments and Licensor Consents, which are insufficient to plead standing. (Id.) Further, they argue that the Zohar Funds' 75% ownership in IMG Holdings is insufficient to confer standing on the Zohar Funds with respect to IMG Fragrance's rights under the License Agreement. (Id. at 2.)

On a motion to dismiss, "it is the burden of the party [asserting standing to sue] . . . clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." Thompson v. Cnty. of Franklin, 15 F.3d 245, 249 (2d Cir. 1994) (internal quotation marks omitted). When considering a party's standing, the Court "accept[s] as

16

true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Id. When a standing motion is considered under Rule 12(b)(6), the district court is authorized to consider matters outside the pleadings. See id.; First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 218 F. Supp. 2d 369, 378 (S.D.N.Y. 2002).

In the present case, the Zohar Funds have alleged sufficient facts to prove their standing to sue under both the License Agreement and the 2004 and 2007 Collateral Assignments and Licensor Consents.

With respect to the License Agreement, Defendants argue that because the Zohar Funds were not parties to the Agreement, they lack standing to seek a declaratory judgment regarding the ownership of the trademarks. (Houb. Mem. at 2.) Although it is true that the Zohar Funds were not parties to the License Agreement, Patriarch, their agent, was assigned all of IMG's rights under that agreement through operation of the Collateral Assignment. (Harrison Decl. Ex. B; FAC ¶ 57.) As principal, the Zohar Funds have standing to sue on the License Agreement, because a principal can sue on a contract entered into by his agent on his behalf. See Kools v. Citibank, N.A., 872 F. Supp. 67, 70 (S.D.N.Y. 1995); Kelly Asphalt Block Co. v. Barber Asphalt Paving Co., 211 N.Y. 68, 70 (1914) (Cardozo, J.);

17

Merrick v. N.Y. Subways Adver. Co., 178 N.Y.S.2d 814, 818 (N.Y. Sup. Ct. 1958). Thus, Defendants' assertion that the Zohar Funds have no rights under the License Agreement because they were not party to it is meritless.

Regarding the Collateral Assignments and Licensor Consents, Defendants make much of the fact that the complaint refers to the Zohar Funds as "succeeding" to the 2004 and 2007 Collateral Assignments and Licensor Consents. (Houb. Mem. at 4-5.) They argue that "succeeding to a loan" has no legal significance and, even if it did, the FAC merely provides conclusory allegations of "successorship" but does not allege that the Zohar Funds ever became parties to, or had rights under, any of the contracts at issue. (Houb. Mem. at 2-4). But Defendants neglect the fact that the agreements at issue were enforceable by successors and assigns. (FAC ¶¶ 16-17.) As discussed above, the Zohar Funds became lenders under both the 2004 and 2007 Loan Agreements. See supra Part 2(c). Further, their agent, Patriarch, was assigned all of the rights and authorities of lenders' Agent under the 2004 and 2007 Loan Agreements (which incorporated their respective Collateral Assignments and Licensor Consents). (Harrison Decl. Ex. B.)

Any deficiency in the complaint's allegations of how the assignments were executed is ameliorated by undisputed facts

18

detailed in the parties' papers.  See Baur v. Veneman, 352 F.3d

625, 631 (2d Cir. 2003) ("[A]t the pleading stage, standing

allegations need not be crafted with precise detail . . . .");

Sullivan v. Syracuse Housing Auth., 962 F.2d 1101, 1107 (2d Cir.

1992).  That Patriarch is not a named party is immaterial, since

the FAC sufficiently alleges that Patriarch was the Zohar Funds'

agent.  See Kelly Asphalt Block Co., 211 N.Y. at 70.

        For the reasons detailed above, Defendants' argument that

the Zohar Funds cannot assert a claim for tortious interference

with the 2004 and 2007 Collateral Assignments also fails.

        d. Count I:  Declaratory Judgment for the Ownership of
           the Trademark Rights

        Plaintiffs' first claim asks the Court to declare that IMG

and the Zohar Funds validly exercised their right under the

License Agreement to purchase the licensed trademarks and that

IMG is now the equitable and lawful owner of those trademarks.

(FAC ¶ 57.)  Defendants have failed to raise an argument in

their papers refuting Plaintiffs' contention that IMG is the

equitable and lawful owner of the trademarks, and therefore,

Defendants' motion to dismiss Count I is denied.  See Guzman v.

Macy's Retail Holdings, Inc., No. 09 Civ. 4472, 2010 WL 1222044,

at *8 (S.D.N.Y. Mar. 29, 2010).

                                19

### e. Claims Under the 2004 and 2007 Collateral Assignments

Having decided that the Zohar Funds have standing and that the 2004 Collateral Assignment is enforceable, the Court will now address Plaintiff's breach of contract and tortious interference claims under the 2004 and 2007 Collateral Assignments.  The 2004 and 2007 Collateral Assignment are identical in all material respects, except for the dates of execution, the name of the loan agreements, and the name of the assignee.  See supra Parts 2(c) & 4(b); Harrison Decl. Ex. B; Michael Decl. Ex. 12.  Therefore, this section will treat the claims made under the 2004 and 2007 Collateral Assignments together and will only refer to them separately if necessary.

### i. Counts VII & IX:  Breach of The Collateral Assignments

To prevail on a breach of contract claim, a plaintiff must establish: (1) the existence of a contract; (2) performance by the party seeking recovery; (3) nonperformance by the other party; and (4) damages attributable to the breach. Musket Corp. v. PDVSA Petroleo, S.A., 512 F. Supp. 2d 155, 160 (S.D.N.Y. 2007).

The Zohar Funds claim that Houbigant breached the Collateral Assignments by entering into various agreements with IMG without first obtaining the written consent of the Zohar

Funds.  (See FAC ¶¶ 82-84, 89-92.)  The pertinent part of the
Collateral Assignments reads:

> Licensor [Houbigant], upon notice to it of this
> Assignment, is hereby authorized to recognize
> Assignee's [Lenders' Agent] claims to rights hereunder
> without investigating any reason for any action taken
> by Assignee or the validity or the amount of the
> obligations or existence of any default, or the
> application to be made by Assignee of any of the
> amounts to be paid to said Assignee.

> Without first obtaining the written consent of
> Assignee, Assignor [IMG] shall not (i) amend or modify
> the License Agreement or (ii) agree to or suffer any
> amendment, extension, renewal, release, acceptance,
> forbearance, modification or waiver with respect to
> any rights arising under the License Agreement.

(Harrison Decl. Ex. B; Michael Decl. Ex 12. (emphasis
added).)

Defendants argue that the Collateral Assignments' language
does not promise any performance on the part of Houbigant, but
rather was an "endorse[ment of] IMG's pledge of IMG's License
rights and IMG's promise to seek and obtain advance Assignee
consent of License Amendments."  (Houb. Mem. at 11.)  The Court
agrees with Defendants' reading.  The plain meaning of the
phrase "authorized to recognize" used in the Collateral
Assignment's provision regarding the Licensor does not create
any affirmative obligation; it merely permits Houbigant to
acknowledge Congress's claim to the license rights as valid if
such rights are asserted in connection with a default on the

21

Loan Agreements.  Therefore, the Zohar Funds cannot state a claim for breach of this provision.

The Zohar Funds contend that because the Loan Agreements have a separate requirement that IMG obtain the lenders' prior written consent before modifying or amending the License Agreement, Defendants' reading of the Collateral Assignments would render those provisions superfluous.  (See Pl. Opp'n Mem. at 11; Harrison Decl. Exs. G § 9.26, W § 5.19.)  The Court does not agree.  As Houbigant was not a party to the Loan Agreements it would have no knowledge, absent such a provision, that IMG was assigning lenders its rights under the License Agreement, to be exercised only in the event of IMG's default under the Loan Agreements.  (See Harrison Decl. Ex. M § 31.)

Further, the Court rejects Plaintiffs' interpretation of the Collateral Assignments because the term "Licensor" is not referenced in the "prior written consent" provisions at all. Instead, the "prior written consent" provisions state only that the burden of "obtaining the written consent" of Congress is on Assignor, i.e., IMG.  Thus, the Zohar Funds have failed to state a claim for breach of the Collateral Assignments, and, therefore, with respect to Counts VII and IX, Defendants' motion to dismiss is granted.

22

ii.  Counts VIII & X:   Tortious Interference

The Zohar Funds plead, in the alternative to their claims

for breach of the Collateral Assignments, that Houbigant

"knowingly and intentionally interfered with [the Collateral

Assignments] without reasonable justification so as to derive

more profit from the License Agreement than was permissible"

under the License Agreement.   (FAC ¶¶ 87, 95.)   They allege that

Houbigant "knew and acknowledged that IMG was contractually

required by the 2004 [and 2007] Collateral Assignment[s] of

License Agreement to obtain written consent before it entered

into the [Unauthorized Agreements]."   (FAC ¶¶ 86, 94.)   But the

Zohar Funds fail to make sufficient allegations that Houbigant

procured or intended to procure IMG's breach, and therefore

Defendants' motion to dismiss Counts VIII and X is granted.

Under New York law, a claim for tortious interference

requires "the existence of a valid contract between plaintiff

and a third party, defendant's knowledge of the contract,

defendant's intentional procurement of the third-party's breach

of the contract without justification, actual breach of the

contract, and damages resulting therefrom."   Lama Holding Co. v.

Smith Barney Inc., 88 N.Y.2d 413, 424 (1996).

The Zohar Funds have not alleged facts showing that

Houbigant procured, or intended to procure, IMG's breach of the

Collateral Agreements.  At most, the Amended Complaint alleges that Houbigant was aware of IMG's breach; there is no allegation that Houbigant intended that IMG breach the Collateral Assignments or indeed that it procured that breach at all. Houbigant merely intended to continue its licensing arrangement with IMG and was working with IMG to create a solution to its payment problems.  See supra Part 2(d).  The Zohar Funds' demonstration that Houbigant may have been aware that IMG was breaching the Collateral Agreement is insufficient to show that Houbigant intended to procure IMG's breach.  Cf. G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 768 (2d Cir. 1995) (affirming the dismissal of appellees' tortious interference claim and reasoning that "[n]othing in the allegations may reasonably be read to suggest that the target of appellees' conduct was [the third party's] contractual arrangements with appellants").

### iii.  Count III:  Declaratory Judgment Voiding the Unauthorized Agreements

In Count III, the Plaintiffs ask the Court to declare the Unauthorized Agreements void because they were entered into "without prior written lender consent as required" under both the 2004 and 2007 Collateral Assignments.[4]  (FAC ¶¶ 64-66.)

---

[4] In Plaintiffs' papers, Plaintiffs claim that the Unauthorized Agreements are also void under the 2004 and 2007 Licensor's
(cont'd on next page)

24

Plaintiffs assert that the "advance written consent" provision was an implied condition precedent to "any effectiveness of the unauthorized amendments."[5]  (Pl. Opp'n Mem. at 31; FAC ¶ 65.)

With respect to IMG and Dana, Defendants argue that they lack standing to assert Count III because the "prior written consent" provision is a third party's right, in which neither Dana nor IMG has any legal interest.  (Houb. Mem. at 17-18.) The Court agrees.

A party to a contract cannot seek to enforce a provision that imposes an obligation on that party and which was plainly inserted for the benefit of the other party.  See Warth v. Seldin, 422 U.S. 490, 499 (1975) (stating that a plaintiff must assert his own legal rights and cannot rest his claim to relief on the legal rights of third parties); Small v. Gen. Nutrition Cos., Inc., 388 F. Supp. 2d 83, 87 (E.D.N.Y. 2005) (same). Further, even if IMG or Dana had standing to assert this claim, the Court rejects Plaintiffs' attempt to enforce that the

─────────────────────────────────

(cont'd from previous page)
Consents because they were executed without first giving the lenders' Agent the right to cure any breaches.  (See Pl. Opp'n Mem. at 31.)  However, since this allegation is not addressed in the FAC, the Court will disregard it.

[5] The phrase that Plaintiffs claim creates a condition precedent in the Collateral Assignments is "[w]ithout first obtaining the written consent of Assignee . . . ."  (See Pl. Opp'n Mem. at 31-32; Harrison Decl. Ex. B.)

"advance written consent" provision as a condition precedent to the validity of the Unauthorized Agreements.  IMG and Dana are essentially claiming that the Unauthorized Agreements are void because they themselves failed to comply with a condition precedent.  Such a claim cannot be allowed to proceed.  See Spanos v. Skouras Theatres Corp., 364 F.2d 161, 169 (2d Cir. 1966) (en banc) ("'One who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition.  He will not be permitted to take advantage of his own wrong, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised.'" (quoting 3A Arthur L. Corbin, Corbin on Contracts § 767 (1960))); see also In re Bankers Trust Co., 450 F.3d 121, 127-28 (2d Cir. 2006).  It was IMG's obligation alone to obtain lenders' consent before entering into any amendments or modifications; IMG cannot now maintain an action against Houbigant for that failure.

Regarding the Zohar Funds, Defendants contend that the language of the Collateral Assignments does not create an implied condition precedent.  They argue that any failure to comply with that language would result in the right to damages for breach, not the voiding of the agreements.  (Houb. Mem. at 12-13.)  Alternatively, Defendants argue that the Zohar Funds

waived or ratified the Unauthorized Agreements by failing to promptly avoid them and by accepting their benefits when acquiring control of IMG.  (Houb. Mem. at 13-14.)

As discussed above, Houbigant did not owe any obligation to obtain the Zohar Funds' prior written consent before entering into License amendments or modification; that was solely IMG's duty.  See supra Part 4(e)(i).  Regardless of whether the language in the collateral assignment creates a condition, it is inapplicable to Houbigant.  Therefore, Defendants' motion to dismiss Count III is granted.

### f. Claims Under the 2004 and 2007 Licensor Consents

The 2004 Licensor Consent is identical to the 2007 Licensor Consent in all material respects, except for the dates of execution, name of the loan agreements, and the names of the lenders' Agent.  See supra Part 2(c); Harrison Decl. Exs. K, O. Therefore, this section will treat the claims made under the 2004 and 2007 Licensor Consents together and will only refer to them separately if necessary.

### i. Counts XI & XII:  Breach of Contract

The Zohar Funds allege that Houbigant breached the 2004 and 2007 Licensor Consents "when it failed to provide the lenders notice and an opportunity to cure IMG's defaults and instead demanded payments from IMG and entered into" the Unauthorized

27

Agreements.   (FAC ¶¶ 98, 102.)   The relevant provision of the
Licensor Consents reads:

> Licensor hereby agrees that prior to exercising any
> rights or remedies under the License Agreement,
> Licensor shall give the Agent written notice of any
> event which Licensor claims would constitute a
> default by Licensee under the License Agreement
> ("Notice of Default").   Upon receipt of a Notice of
> Default, the Agent shall have the right and
> opportunity, but not the obligation, to cure such
> default for Licensee's account, within the same time
> given to Licensee in the License Agreement and on the
> terms and conditions set forth in such License
> Agreement.

(Harrison Decl. Ex. K § 3.)

The FAC alleges that Houbigant breached this provision when
it "failed to provide the lenders notice and an opportunity to
cure IMG's defaults and instead demanded payment from IMG and
entered into the [U]nauthorized [A]greements."   (FAC ¶¶ 98,
102.)   The right to demand payment is the exercise of a right
under the License Agreement, thus when IMG failed to make its
royalty payments timely and Houbigant demanded that it pay, it
exercised a right under the License Agreement.   Further, the FAC
alleges that Houbigant "even issu[ed] a default notice on
January 3, 2007."   (Id. ¶ 45.)   Finally, it alleges that
Houbigant did not give written notice of IMG's defaults.   (Id.
¶¶ 98, 102.)   These allegations are sufficient to state a claim
for breach of the Licensor Consents.

28

The Court rejects Defendants' argument that the License "granted only one right to Houbigant" for a breach of the license.  Notably, section 15(c) of the License Agreement gives Houbigant another right.  Although not relevant to the current claims, Houbigant, upon a "reasonable belief. . . that Licensee may have breached the terms of this Agreement," has the right to review and inspect IMG's relevant books and records.  (See Harrison Decl. Ex. L § 15(c).)  For the reasons stated, Defendants' motion to dismiss Counts XI and XII is denied.

### g. Plaintiffs' Tort Claims

This section will discuss Plaintiffs' three tort claims: aiding and abetting breach of fiduciary duty; aiding and abetting fraud; and civil conspiracy to defraud.  These claims arise primarily from a series of facts alleged in the FAC including:  Houbigant's entering into the Unauthorized Agreements with IMG while allegedly knowing that IMG was not authorized to do so; the allegedly misleading "good standing" letter that Houbigant drafted and sent to the lenders, which omitted reference to IMG's failure to make royalty payments and the unauthorized Second Deferral Agreement; and the bank account information that Houbigant gave to IMG, which was in a name other than Houbigant, for the alleged purpose of concealing the

"sham" consulting agreement from the lenders.  (FAC ¶¶ 27, 32-34, 40-49.)

First, this section will address IMG's and Dana's aiding and abetting breach of fiduciary duty claim.  It will then address the Zohar Funds' aiding and abetting fraud claim. Finally, it will discuss Plaintiffs' civil conspiracy claim (together with the aiding and abetting fraud claim, the "fraud-based claims").

### i. Count IV:  Aiding and Abetting Breaches of Fiduciary Duty

In their first tort claim, IMG and Dana allege that Cohen and Zamarelli breached their fiduciary duties to the IMG entities they managed by "entering into the unauthorized agreements . . . and by concealing from the lenders the existence of these agreements, any alleged defaults that may have engendered them, and the additional liabilities purportedly owed" to Houbigant.  (FAC ¶ 68.)  They assert that Houbigant knew that IMG was not authorized to amend the License or enter into any of the other Unauthorized Agreements without the express written consent of the lenders.  (Id. ¶ 69.)  Further, by entering into the Unauthorized Agreements, Defendants "substantially assisted Cohen's and/or Zamarelli's breaches of fiduciary duty so as to derive more profit from the License

Agreement than was permissible under that Agreement."   (Id.
¶ 70.)

Defendants assert that, under New York law, IMG's and
Dana's claim is barred by the "sole shareholder" rule.   That
rule precludes a corporation's claim against a third party for
aiding and abetting a breach of fiduciary duty owed to it where
the breach of duty was by the corporation's sole shareholder.
(Reply Memorandum in Further Support of Defendants' Motion to
Dismiss ("Reply Mem.") at 12.)   Essentially, the "sole
shareholder" rule imputes the shareholder's knowledge of the
wrongful conduct to the corporation, making the corporation a
guilty party as well.   Mediators, Inc. v. Manney, 105 F.3d 822,
827 (2d Cir. 1997); 546-552 W. 146th St. LLC v. Arfa, 863
N.Y.S.2d 412, 415 (N.Y. App. Div. 2008).

IMG and Dana argue that the controlling law is Florida law,
which rejects Mediators.   Further, they argue that the "sole
actor rule" does not apply, first, because Cohen acted adversely
to IMG's interests, second, because there was an "innocent"
party who was deceived but who would have taken steps to bring
the fraud to an end, and third, because the "wrongdoer is no
longer in a position to benefit from his wrongs."   (Pl. Opp'n
Mem. at 37-38.)   The Court finds Plaintiffs' arguments without
merit.

31

The Court concludes that this case fits squarely within the "sole actor" rule as articulated in Mediators and In re Fuzion Technologies Group, Inc., 332 B.R. 225 (Bankr. S.D. Fla. 2005), the case Plaintiff contends should control.[6]  The Court need not decide whether Florida or New York law applies because both jurisdictions essentially apply the same legal framework to cases where a sole shareholder breached his fiduciary duty to the corporation that is now suing a third party for aiding and abetting that breach.  Compare Mediators, 105 F.3d at 827 ("[The 'sole shareholder'] rule imputes the agent's knowledge to the principal notwithstanding the agent's self dealing because the party that should have been informed was the agent itself albeit in its capacity as principal."), with In re Fuzion, 332 B.R. at 230 ("[T]he general principle of the 'sole actor' exception provides that, if an agent is the sole representative of a

---

[6] Defendants point out that In re Fuzion has been overruled. Compare Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1151 (11th Cir. 2006) (defense of in pari delicto may be asserted against bankruptcy trustees) with In re Fuzion, 332 B.R. at 236 ("[A]s a matter of law, the in pari delicto defense does not apply to the bankruptcy trustee.") However, the point of law that was overruled by Edwards is not relevant to the present discussion because it relates to the application of the defense to a bankruptcy trustees, not the corporation itself.  See In re Greater S.E. Comm. Hosp. Corp. I, 353 B.R. 324, 362 (Bankr. D. Colo. 2006) (noting that the In re Fuzion holding that the in pari delicto doctrine should not apply to bankruptcy trustees has been effectively overruled).

principal, then that agent's fraudulent conduct is imputable to
the principal regardless of whether the agent's conduct was
adverse to the principal's interests."), and O'Halloran v.
PricewaterhouseCoopers LLP, 969 So. 2d 1039, 1045 (Fla. Dist.
Ct. App. 2007) ("Where a corporation is wholly dominated by
persons engaged in wrongdoing, the corporation has itself become
the instrument of wrongdoing.  This principle comes into play
when there is no innocent member of management who could act to
thwart the wrongdoing.") (internal citation omitted)).

The "sole shareholder" rule is an outgrowth of the general
agency law principle that acts of an agent, within the scope of
employment, are imputed to the principal.  See Center v. Hampton
Affils., 66 N.Y.2d 782, 784, 488 N.E.2d 828 (1985).  This is
because there is a presumption that an "agent has discharged the
duty of disclosing material facts to the principal."  Mediators,
105 F.3d at 827.  Although, there is an exception to that
general rule—the "adverse interest" exception—it does not apply
when the principal is the wronged corporation and the "rogue"
agent is its sole shareholder.  Id.  Even if the sole
shareholder totally abandons the corporation's interests, the
"sole actor" rule imputes the agent's knowledge to the principal
because the "party that should have been informed was the agent

33

itself albeit in its capacity as principal." Id.; see also In re Fuzion, 332 B.R. at 231.

In the present case, the "sole shareholder" rule operates to preclude any recovery for this claim. Cohen, the former sole shareholder of IMG Holdings, is alleged to have breached his fiduciary duty to the corporation. (FAC ¶ 68.) Therefore, his knowledge of any wrongdoing is imputed to IMG and Dana, making them guilty of the same wrongs as Cohen.

IMG's and Dana's contention that the "adverse interest" exception applies is misguided. As stated, the exception does not apply here.

IMG's and Dana's next argument is also unpersuasive. IMG and Dana cite In re Fuzion for the proposition that a "plaintiff may defeat the sole actor exception . . . by showing that there was someone 'involved in [wronged corporation's] management who was ignorant of the ongoing fraud and could and would if advised of facts known to defendant have taken steps to bring the fraudulent conduct to an end.'" 332 B.R. at 231. But the Zohar Funds were not involved in IMG's or Dana's management at the time of the fraud; thus, this proposition does not help the Plaintiffs.

IMG's and Dana's final argument that "the sole shareholder" rule does not apply when the wrongdoer is no longer in a

34

position to benefit from his wrongs essentially is a fairness argument.  Plaintiffs only cite only two cases for this proposition, neither of which applies New York law or Florida law and both of which involve very different factual histories. See Scholes v. Lehmann, 56 F.3d 750, 754 (7th Cir. 1995) (fraudulent conveyance claim where the corporation utilized in a Ponzi scheme was no longer controlled by the mastermind but was instead controlled by a receiver appointed to maximize the corporation's value for the benefit of the "duped" investors); In re Adelphia, 365 B.R. 24, 55 n. 124 (Bankr. S.D.N.Y. 2007) (applying Pennsylvania law) (stating that the court, "does not here have to decide how it would address" the fairness of applying the equitable defense of in pari delicto).  For the reasons stated, Defendants' motion to dismiss Court IV is granted.

### ii. The Fraud-Based Claims

Plaintiffs' final two tort claims sound in fraud.  First, the Zohar Funds allege that Defendants aided and abetted Cohen's and Zamarelli's fraud on the lenders.  (FAC ¶¶ 72-77.)  Second, IMG and Dana, together with the Zohar Funds, claim that Defendants conspired with Cohen and Zamarelli to defraud the lenders.  (Id. ¶¶ 78-81.)

35

a. The Zohar Funds' Fraud-Based Claims
Are Distinct from Their Breach of
Contract Claims

Defendants argue that the Zohar Funds' fraud-based claims
are barred because the claimed tort damages would be recoverable
as breach of contract damages under the various "financing
agreements." (Sherman Mem. at 15-16; Reply Mem. at 1.) They
maintain that if the various financing agreements' pre-
performance disclosure obligations were not breached, the
Unauthorized Agreements and the missed royalty payments would
have been revealed prior to the Zohar Funds' initial loan.
(Reply Mem. at 1.)

Under New York law, a fraud claim will not lie if it arises
"out of the same facts as plaintiff's breach of contract claim."
Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 196 (2d
Cir. 2001) (citation omitted). To succeed on a fraud claim
arising out of a breach of contract, a plaintiff must show that
the claim is sufficiently distinct from the breach of contract.

> [P]arallel fraud and contract claims may be brought if
> the plaintiff (1) demonstrates a legal duty separate
> from the duty to perform under the contract; (2)
> points to a fraudulent misrepresentation that is
> collateral or extraneous to the contract; or (3) seeks
> special damages that are unrecoverable as contract
> damages.

See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d
171, 183-184 (2d Cir. 2007); see also Bridgestone/Firestone,

Inc. v. Recovery Credit Servs. Inc., 98 F.3d 13, 20 (2d Cir.
1996); Deerfield Comm'ns Corp. v. Chesebrough-Ponds, Inc., 68
N.Y.2d 954, 956, 502 N.E.2d 1003 (1986).

        The present case fits within category (2) above.  The Zohar
Funds' breach of contract claim against Houbigant stems from
Houbigant's failure to notify the Lenders of IMG's inability to
make timely royalty payments and Houbigant's subsequent
execution of the Unauthorized Agreements with IMG.  The fraud-
based claims, on the other hand, arise out of Houbigant's
alleged acts that assisted IMG in concealing those agreements
from its lenders.  Thus, the alleged misrepresentations and
concealments are sufficiently extraneous to the facts giving
rise to the breach of contract claims to form the basis for a
fraud claim.

                        b. Count V:  Aiding and Abetting Fraud

        The Zohar Funds' first fraud-based claim alleges that
Defendants aided and abetted Cohen's and Zamarelli's fraud on
the Zohar Funds and other lenders.  The Zohar Funds contend that
Defendants knew Cohen and Zamarelli were deceiving the lenders
about IMG's compliance under the License Agreement and were
concealing from them the Unauthorized Agreements.  (FAC ¶ 73.)
The Zohar Funds further allege that Defendants substantially
assisted Cohen's and Zamarelli's fraud by drafting a misleading

                                37

"good standing" letter that was submitted to the lenders,
including the Zohar Funds, which omitted reference to IMG's
royalty payment delays, the deferral agreements, and the "sham"
consulting agreement.  (Id. ¶ 75.)  Moreover, Houbigant provided
a bank account to IMG, which was not in Houbigant's name,
allegedly to mask the true recipient of the "consulting" fee,
further assisting the deceit about IMG's compliance under the
License Agreement.  (Id.)

A plaintiff alleging an aiding-and-abetting fraud claim
must allege (1) the existence of the underlying fraud, (2)
defendant's actual knowledge of the fraud, (3) and substantial
assistance.  See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292
(2d Cir. 2006); Oster v. Kirschner, 905 N.Y.S.2d 69, 72 (N.Y.
App. Div. 2010).  To plead a claim for fraud in New York, a
plaintiff must establish, (1) a material, false representation;
(2) an intent to defraud thereby; (3) reasonable reliance on the
representation; (4) damage to the plaintiff; and (4) actual and
proximate causation.  Chanayil v. Gulati, 169 F.3d 168, 171 (2d
Cir. 1999); Eurycleia Partners, LP v. Seward & Kissel, LLP, 12
N.Y.3d 553, 559, 883 N.Y.S.2d 147, 150 (2009).  A plaintiff's
fraud damages must be an actual loss as a direct result of the
wrong.  Spencer Trask Software & Info. Servs. LLC v. RPost Int'l
Ltd., 383 F. Supp. 2d 428, 454 (S.D.N.Y. 2003).  But out-of-

38

pocket losses must not be merely speculative; the fact that a plaintiff has suffered a loss must be certain.  Id. at 454. However, that the loss is unliquidated or difficult to compute does not render damages uncertain.  See Mfrs. & Traders Trust Co. v. Bittorf, 627 N.Y.S.2d 686, 686 (N.Y. App. Div. 1995); Lynch v. Plesch, 167 N.Y.S.2d 885, 886 (N.Y. Sup. Ct. 1957).

To survive a motion to dismiss, a plaintiff must plead fraud with particularity.  Fed. R. Civ. P. 9(b).  However, while the "'actual ... fraud alleged must be stated with particularity ... the requisite intent of the alleged [perpetrator of the fraud] need not be alleged with great specificity.'"  Wight v. BankAmerica Corp., 219 F.3d 79, 91 (2d Cir. 2000) (quoting Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996)).  The particularity requirements of Federal Rule of Civil Procedure 9(b) apply to claims of aiding and abetting fraud no less than to direct fraud claims.  Filler v. Hanvit Bank, 156 F. App'x 413, 417 (2d Cir. 2005); King Cnt'y, Wash. v. IKB Deutsche Industriebank AG, No. 09 Civ. 8387, 2010 WL 4366191, at *6 (S.D.N.Y. Oct. 29, 2010) ("9(b)'s heightened pleading standard for fraud applies to claims of aiding and abetting fraud as well." (citing Wight v. BankAmerica Corp., 219 F.3d 79, 91-92 (2d Cir. 2000))).  Taking the allegations in the complaint as true, the Zohar Funds have made sufficient allegations that

39

Defendants aided and abetted fraud to meet the heightened
pleading standard articulated in Rule 9(b).  See In re Carter-
Wallace, Inc., Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000).

                                                       i. The Underlying Fraud Claim

The Zohar Funds have alleged detailed facts regarding how
Cohen and Zamarelli committed the underlying fraud on the Zohar
Funds in their capacity as lenders and in their capacity as
assignee of Wells and Congress, thus fulfilling the first
element of the aiding and abetting fraud claim.  (See FAC ¶¶ 27-
50.)

The Zohar Funds allege Cohen and Zamarelli caused false
cash forecasts to be sent to the Zohar Funds and executed a
compliance certificate that falsely represented that IMG had not
failed to pay amounts owing under the License Agreement, when in
fact, it had.  (Id. ¶¶ 31, 43.)   Further, they claim that Cohen
and Zamarelli, in connection with Houbigant, caused a "good
standing" letter to be sent to the lenders that was allegedly
misleading in two respects.  First, it was sent approximately
two days after the parties entered the Second Deferral but did
not mention that agreement, and second, it implied IMG was in
compliance under the License Agreement, when in fact it was
merely in compliance under the new, undisclosed Second Deferral
agreement.  (Id. ¶¶ 29-33.)   These allegations are sufficient to

allege a material, false representation was made to the Zohar Funds.

The Zohar Funds also sufficiently allege that Zamarelli and Cohen intended to defraud the lenders. The FAC quotes Zamarelli's October 1, 2006 email to Cohen that shows that they were deliberately concealing the "sham" consulting agreement from the lenders. (Id. ¶ 42.) In that email, Zamarelli stated, "Timebombs ahead; we've masked so much to buy more time that I don't even know if I can remember everything . . . . If the bank finds the 'new' consulting expense . . . and if they see it's to Houbigant they will see right through what we did regarding the 'forgiveness.'" (Id.) Additionally, with respect to the good standing letter, Zamarelli wrote to Houbigant's attorney and stated "I think we just need Houbigant to say that under the terms of our agreement (don't specify second deferral agreement), we are in compliance as of this date . . . we don't want to necessarily disclose the restructure fee . . . ." (Id. ¶ 32.) These detailed allegations are sufficient to show Cohen's and Zamarelli's intended to conceal material information regarding IMG's royalty payment problems from the lenders.

Reasonable reliance on the fraudulent statement also has been adequately alleged to survive a motion to dismiss. The FAC alleges that the Zohar Funds required a representation from

41

Houbigant that IMG was in good standing and relied on that statement in deciding to assume certain loans in May 2005.  (Id. ¶ 28.)  The Zohar Funds claim that the "good standing" letter Houbigant sent was misleading and that they would not have "restructured the Dana Loans or have provided additional loans" had they known the truth about "the way the License Agreement was being implemented."  (Id. ¶¶ 32-33, 50.)  It is entirely reasonable that the Zohar Funds relied on the letter of good standing submitted by Houbigant; the Houbigant license amounted to much of IMG's business and a representation that IMG was not in good standing would likely affect the terms upon which the Zohar Funds would become lenders.

On the issue of damages, the Zohar Funds have adequately alleged that they have suffered a pecuniary injury.  Although the total amount of losses is, at the moment, indefinite, there are sufficient, plausible allegations the Zohar Funds have experienced at least some pecuniary harm.  Plaintiffs' allegations on damages are as follows:  none of the "approximately $40 million in total loans by the Zohar Funds have been repaid, including loans with an original maturity date of May 2009"; Dana is in default "on at least $11 million of loans"; some loans to Dana have been foreclosed on at a loss;

42

and "the rating agencies have assessed a recovery rate on the [remaining] loans of between 50 and 60 percent." (FAC ¶¶ 50-52.)

Defendants cite First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994), and contend that Plaintiffs have not sufficiently alleged out-of-pocket losses because such losses, if any, cannot be established until it is determined whether the "collateral is insufficient to make the plaintiff whole, and if so, by how much." Id. at 768; Reply Mem. at 6-7. The Zohar Funds assert that Gelt is inapplicable because it is predicated on a RICO claim and discusses damages in the context of a standing question under RICO. (See Pl. Opp'n Mem. at 16.)

Without deciding the applicability of Gelt, the Court finds that Plaintiffs have stated sufficient facts to demonstrate that they have suffered pecuniary losses. First, taking Plaintiffs' allegations as true, although the actual amount of loss is not certain, Plaintiff's have at least alleged that $11 million in loans are in default and that some of the loans to Dana have been foreclosed at a loss. (FAC ¶ 52.) As noted above, to plead damages with sufficient certainty, a plaintiff need only make certain the fact of out-of-pocket losses, not necessarily the exact extent of such losses. See Broffee v. Horton, 172 F.2d 489, 495 (2d Cir. 1949); 37 Am. Jur. 2d Fraud & Deceit § 390. Second, even if the Plaintiffs have not sufficiently

43

alleged damages cause by the fraud, where a transaction has been induced by fraud, the person defrauded is entitled to at least nominal damages, even where he or she fails to prove actual damages.  See Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc., 453 N.Y.S.2d 750, 755 (N.Y. App. Div. 1982); 60A N.Y. Jur. 2d Fraud & Deceit § 257.

Finally, the Zohar Funds have sufficiently pleaded proximate causation.  Under New York law, an "'injury is proximately caused if it is the natural and probable consequence of the defrauder's misrepresentation or if the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud.'"  Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1496 (2d Cir. 1992) (quoting Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1044 (2d Cir. 1986)).  Essentially, the damages must be reasonably foreseeable to the defendant so that imposing liability is fair.  See Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc., No. 07 Civ. 7483, 2010 WL 4892646, at *13 (S.D.N.Y. Dec. 2, 2010).  The Zohar Funds alleged that Cohen's and Zamarelli's misrepresentations and misstatements induced them to proceed with the loan as they did.  (FAC ¶ 22.) They claim that Dana's ability to pay the royalty payments and its compliance with the License Agreement were crucial in assessing Dana's financial prospects, which in turn, was crucial

44

in determining whether to continue financing Dana, and on what terms.  (Id. ¶¶ 27-28.)  It seems entirely plausible that it was foreseeable to Cohen and Zamarelli that misrepresenting and concealing information regarding IMG's and Dana's finances and their compliance under the License, would induce the Zohar Funds to make the allegedly injurious loans and would undercut the value of lenders' security interest.

### ii. Actual Knowledge

Plaintiffs have also sufficiently alleged actual knowledge of the underlying fraud.  To prevail on an aiding and abetting claim, a plaintiff must allege "actual knowledge—allegations of constructive knowledge or recklessness are insufficient." Nathel v. Siegal, 592 F. Supp. 2d 452, 468 (S.D.N.Y. 2008) (citing Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007)).  Although the allegation of actual knowledge does not have to be based on defendant's explicit acknowledgment of the fraud, the burden of demonstrating actual knowledge is a heavy one and is subject to the heightened pleading standard of Rule 9(b).  See Lerner, 459 F.3d at 292-93; Nathel, 592 F. Supp. 2d at 468; Terrydale Liquidating Trust v. Barness, 611 F. Supp. 1006, 1027 (S.D.N.Y. 1984).  Plaintiffs have met that burden.  Plaintiffs have stated particular facts that make it plausible that Houbigant knew that

45

Cohen and Zamarelli were defrauding their lenders and misrepresenting IMG's ability to comply with the License Agreement's payment terms.  For example, Plaintiffs allege that Houbigant's attorney, John Schryber, was aware that IMG did not want to disclose the Second Deferral Agreement because he and Zamarelli discussed omitting reference to it in the "good standing" letter.  (FAC ¶ 32.)  Further, the execution of the "sham" consulting agreement between IMG and Houbigant for the exact amount of "forgiven" past due royalties also raises an inference that Defendants were aware that Cohen and Zamarelli were deceiving their lenders.  (Id. ¶ 41.)  That inference is bolstered by the fact that Houbigant was asked to provided and did provide, a different bank account from its usual one, in a name other than Houbigant, to which the "consulting fees" would be routed.  (Id. ¶ 32.)  Although there is no allegation that Houbigant explicitly referenced the fraud, the allegations in the FAC raise an inference that Houbigant was aware that IMG was defrauding its lenders.

### iii. Substantial Assistance

Finally, Plaintiffs have sufficiently pleaded the substantial assistance element of the aiding and abetting fraud claim.  Substantial assistance occurs "'when a defendant affirmatively assists, or helps conceal, or fails to act when

required to do so, thereby enabling the fraud . . . to occur.'"
Nathel, F. Supp. 2d at 470 (quoting Fraternity Fund, 479 F.
Supp. 2d at 370).  Where the underlying fraud claim is
"predicated on misrepresentations in documents, substantial
assistance usually involves assistance in the preparation or
dissemination of the documents." Id.  Here, Plaintiffs alleged
that Houbigant wrote a good standing letter specifically
designed to omit reference to IMG's royalty payment delays and
the Second Deferral agreement.  (FAC ¶ 32.)  They also allege
that Zamarelli asked Houbigant to provide a "second" bank
account that did not refer to Houbigant through which to channel
the "consulting fees."  (Id. ¶ 48.)  These acts by Houbigant and
Sherman are alleged to have furthered and assisted Cohen's and
Zamarelli's fraud on IMG's lenders.  The alleged acts fit
squarely within the definition of substantial assistance.  Thus,
for the above reasons, Defendants' motion to dismiss Count V is
denied.

### c. Count VI: Civil Conspiracy

Plaintiffs' final fraud-based claim alleges that Defendants
conspired with Cohen and Zamarelli to defraud the lenders by
agreeing to submit "false and/or misleading statements to the
lenders and conceal[ing] from the lenders the existence of these
agreements, any alleged defaults that may have engendered them,

47

and the additional liabilities purportedly owed." (Id. ¶ 80.)
Under New York law, there is no independent tort for conspiracy.
See Burns Jackson Miller Summit & Spitzer v. Lindner, 452
N.Y.S.2d 80, 93 (N.Y. App. Div. 1982). All that an allegation
of conspiracy can accomplish is to connect nonactors, who
otherwise might escape liability, with the acts of their co-
conspirators. Id. To establish a claim of civil conspiracy,
plaintiff must demonstrate the underlying tort, plus the
following four elements: (1) an agreement between two or more
parties; (2) an overt act in furtherance of the agreement; (3)
the parties' intentional participation in the furtherance of a
common purpose or plan; and, (4) resulting damage or injury.
See Meisel v. Grunberg, 651 F. Supp. 2d 98, 119 (S.D.N.Y. 2009).
In other words, Plaintiffs must establish facts which "support
an inference that defendants knowingly agreed to cooperate in a
fraudulent scheme, or shared a perfidious purpose." Snyder v.
Puente De Brooklyn Realty Corp., 746 N.Y.S.2d 517, 521 (N.Y.
App. Div. 2002).

With respect to the underlying fraud claim, the FAC
sufficiently alleges that Cohen and Zamarelli defrauded their
lenders. See supra Part 4(b)(i). Plaintiffs also allege a
tacit agreement among Cohen, Zamarelli, and Sherman. The FAC
alleges that Houbigant's attorney, John Schryber, was aware that

48

IMG did not want to disclose the Second Deferral Agreement because he and Zamarelli discussed omitting reference to it in the "good standing" letter.  (FAC ¶ 32.)  Further, the execution of the "sham" consulting agreement between IMG and Houbigant for the exact amount of "forgiven" past due royalties also raises an inference that Defendants knew that Cohen and Zamarelli were deceiving their lenders.  (FAC ¶ 41.)  This is sufficient to meet the requirement of an agreement between the parties.  See Meisel v. Grunberg, 651 F. Supp. 2d 98, 121 (S.D.N.Y. 2009).  Plaintiffs have also alleged intentional participation in furtherance of the conspiracy.  Houbigant's drafting of the allegedly misleading "good standing" letter and providing the bank account in the name of a different entity are sufficient acts to meet this requirement.  Finally, as discussed above, resulting damages have been alleged.  See supra Part 4(b)(i).  Thus, for the reasons stated, Defendants' motion to dismiss this Count is denied.

## 5. Conclusion:

For the foregoing reasons, Defendants' motion to dismiss [dkt. no. 49] is GRANTED with respect to Counts III, IV, VII, VIII, IX, and X, and DENIED with respect to Counts I, V, VI, XI,

49

and XII.   The parties shall confer and inform the Court by letter no later than January 4, 2011 how they propose to proceed.

SO ORDERED.

DATED:     New York, New York
           December 17, 2010

_____
LORETTA A. PRESKA, Chief U.S.D.J.